1  BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
2  Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
3  La Jolla, California  92037
Telephone:   (858) 914-2001
4  Facsimile:    (858) 914-2002
E-mail:        fbottini@bottinilaw.com
5                ykolesnikov@bottinilaw.com

6  *Counsel for Plaintiff Marc Hagan*

7  [Additional counsel listed on the signature page.]

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                 WESTERN DIVISION

| | |
|---|---|
| 12 MARC HAGAN, derivatively on behalf of OSI SYSTEMS, INC., | Case No. 2:14-cv-02910 |
| 13                                      Plaintiff, | |
| 14                         vs. | |
| 15 DEEPAK CHOPRA, WILLIAM F. BALLHAUS, JR., DAVID FEINBERG, STEVEN C. GOOD, MEYER LUSKIN, and AJAY MEHRA, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| 18                               Defendants, | |
| 19                            - and - | |
| 20 OSI SYSTEMS, INC., a Delaware corporation, | |
| 21                      Nominal Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiff Marc Hagan ("Plaintiff") brings this action on behalf of Nominal Defendant OSI Systems, Inc. ("OSI" or the "Company") against the six members of OSI's Board of Directors (the "Board"), asserting claims for breaches of fiduciary duties (Counts I and II) and unjust enrichment (Count III). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters. Plaintiff's information and belief are based upon his counsel's investigation, which included, among other things, a review of publicly-available documents and information regarding defendants and OSI, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OSI, and analysts' reports and advisories about OSI.

## NATURE OF THE ACTION

1.     This stockholder derivative action concerns breaches of fiduciary duties by the Board and OSI's senior management from October 2012 to the present (the "Relevant Period").

2.     A Delaware corporation headquartered in Hawthorne, California, OSI designs and manufactures electronic systems and components for the homeland security, healthcare, defense, and aerospace markets. During the Relevant Period, defendants caused OSI to disseminate false and misleading information concerning OSI's Rapiscan full body scanners and its contract(s) with the Transportation Security Administration ("TSA") of the United States Department of Homeland Security.

3.     Defendants' misconduct, specifically their failure to implement and maintain adequate internal controls, led to the cancellation of more

- 1 -

than $60 million in contracts with the TSA and the endangerment of any further business with the federal government.  These same defendants announced, through an OSI spokesman, that they had prior knowledge of these issues with the Rapiscan machines and had informed the TSA of these problems.

4.    Incredibly, three of the six members of the Board sold hundreds of thousands of shares of OSI stock before this material information was made public, and while OSI stock was trading at artificially-inflated prices. These three Board members received over $8 million from these sales. After these Board members unloaded their OSI stock, and once this information was made public, OSI's stock price fell precipitously – more than 30%.

5.    As a result of defendants' wrongdoing, OSI has been damaged. This action seeks to recover damages and obtain injunctive relief on OSI's behalf.

**JURISDICTION AND VENUE**

6.    Jurisdiction is conferred by 28 U.S.C § 1332.  Complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because:

(a)     OSI maintains its principal place of business in this District;

(b)     one or more of the Individual Defendants either resides in or maintains executive offices in this District;

(c)     a substantial portion of the transactions and wrongs set forth below, including the Individual Defendants' primary participation in the wrongful acts, occurred in this District; and

(d)     defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### I.   Plaintiff

9.     Plaintiff Marc Hagen is a current shareholder of OSI and has continuously held OSI stock since 2007.  Plaintiff is a citizen of Washington.

### II.   Nominal Defendant

10.     Nominal Defendant OSI Systems, Inc. is a Delaware corporation, with its principal executive offices at 12525 Chadron Avenue, Hawthorne, California.  OSI's common stock is traded on the NasdaqGS exchange under the symbol "OSIS."  OSI is a citizen of California and Delaware.

### III.   The Individual Defendants

11.     Defendant Deepak Chopra ("Chopra") founded OSI and currently serves as Chairman and Chief Executive Officer ("CEO") and has been a director of OSI since 1992.   According to OSI's website:

> Mr. Chopra also serves as the Chief Executive Officer of our major subsidiaries.  From 1976 to 1979 and from 1980 to 1987, Mr. Chopra held

- 3 -

> various positions with ILC Technology, Inc., a
> publicly traded manufacturer of lighting products,
> including serving as Chairman, Chief Executive
> Officer, President and Chief Operating Officer of its
> United Detector Technology division.  Mr. Chopra
> has also held various positions with Intel
> Corporation, TRW Semiconductors and RCA
> Semiconductors.  Mr. Chopra holds a Bachelor of
> Science degree in Electronics and a Master of
> Science degree in Semiconductor Electronics.

On information and belief, Chopra is a citizen of California.

12.     Defendant William F. Ballhaus, Jr. ("Ballhaus") has served on the OSI Board since May 2010.  Ballhaus is a member of the Audit and Compensation Committees.  According to OSI's website:

> William F. Ballhaus, Jr. has served as a Director of
> the Company since May 2010.  From 2000 to 2007,
> Dr. Ballhaus, now retired, served as President and
> then also as Chief Executive Officer of Aerospace
> Corporation, an organization dedicated to the
> application of science and technology to the solution
> of critical issues in the nation's space program.
> Between 1990 and 2000, Dr. Ballhaus' career
> included positions within the aerospace industry,
> including Corporate Vice President, Engineering
> and Technology for Lockheed Martin Corporation
> and President, Aero and Naval Systems and
> President, Civil Space & Communications, both for
> Martin Marietta.  Between 1971 and 1989, Dr.
> Ballhaus worked for the National Aeronautics and
> Space Administration (NASA), including as Director
> of its Ames Research Center.  Dr. Ballhaus serves on
> the Board of Directors of Draper Laboratory.  Dr.
> Ballhaus has extensive risk management experience
> gained through the various executive and board
> positions that he has held.  Dr. Ballhaus, who has
> published more than 40 papers on computational
> aerodynamics, obtained a Ph.D. in Engineering in
> 1971 and a BS and MS in Mechanical Engineering in

1967 and 1968, all from the University of California at Berkeley.

Upon information and believe, Ballhaus is a citizen of California.

13. Defendant David Feinberg ("Feinberg") has served on the OSI Board since March 2010. Feinberg serves as Chair of the Nominating and Governance Committee. According to OSI's website:

> David T. Feinberg has served as a Director of the Company since March 2010. Dr. Feinberg has served as the President of the UCLA Health System since July 2011 and as Chief Executive Officer of the UCLA Hospital System and Associate Vice Chancellor since July 2007. Prior to assuming these positions, Dr. Feinberg was the medical director of the Resnick Neuropsychiatric Hospital (NPH) at UCLA. Dr. Feinberg is board certified in the specialties of child and adolescent psychiatry, adult psychiatry and addiction psychiatry. He is a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA. Dr. Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange. Dr. Feinberg graduated cum laude in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989. He earned his master of business administration from Pepperdine University in 2002.

On information and belief, Feinberg is a citizen of California.

14. Defendant Steven C. Good ("Good") is a current director and has served on the Board since September 1987. Good serves as the Chair of the Audit Committee and as a member of the Compensation Committee, the Nominating and Governance Committee and the Executive Committee. According to OSI's website:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steven C. Good has served as a Director of the Company since September 1987.  He has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010.  Mr. Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010.  He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries.  Mr. Good founded California United Bancorp and served as its Chairman through 1993.  From 1997 until the company was sold in 2006, Mr. Good served as a Director of Arden Realty Group, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange.  Mr. Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange.  Mr. Good also currently serves as a Director of Rexford Industrial Realty, Inc., a publicly-held Real Estate Investment Trust listed on the New York Stock Exchange.  He also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009. Mr. Good has extensive risk management experience gained through the various executive and board positions that he has held.  Mr. Good holds a Bachelor of Science degree in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.

On information and belief, Good is a citizen of California.

15.     Defendant Meyer Luskin ("Luskin") is a current director and has served on the Board since February 1990.  Luskin serves as the Chairman of the Compensation Committee and serves on the Audit

- 6 -

Committee, the Nominating and Governance Committee and the Executive

Committee.  According to OSI's website:

> Meyer Luskin has served as a Director of the
> Company since February 1990.  Since 1958, Mr.
> Luskin has served as a Director of Scope Industries,
> which is engaged principally in the business of
> recycling and processing food waste products into
> animal feed and has also served as its President,
> Chief Executive Officer and Chairman since 1961.
> He currently serves on the Board of Advisors of the
> Santa Monica – UCLA Medical Center and
> Orthopaedic Hospital and was formerly the
> Chairman.  Mr. Luskin is also a Director of the
> Orthopaedic Institute for Children (previously
> known as the Los Angeles Orthopaedic Hospital)
> and was formerly the Chairman.  Mr. Luskin is also
> a Director on the Advisory Board of the UCLA
> Luskin School of Public Affairs, a Director of the
> UCLA Foundation, a Director of the Alliance for
> College‑Ready Public Schools, and a Director of the
> Jazz Bakery.  Mr. Luskin also served as a Director of
> Myricom, Inc., a computer and network
> infrastructure company.  Mr. Luskin has extensive
> risk management experience gained through the
> various executive and board positions that he has
> held.  Mr. Luskin holds a Bachelor of Arts degree
> from the University of California, Los Angeles and a
> Masters in Business Administration from Stanford
> University.

On information and belief, Luskin is a citizen of California.

     16.    Defendant Ajay Mehra ("Mehra") is a current director and has

served on the Board since 1996.  Mehra is Executive Vice President of OSI

and President of the Rapiscan Systems division.  According to OSI's

website:

> Mr. Mehra joined our company as Controller in
> 1989 and served as Vice President and Chief
> Financial Officer from November 1992 until

November 2002, when he was named Executive Vice President.  Mr. Mehra became a member of our Board of Directors in March 1996.  Prior to joining our company, Mr. Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc. and United Detector Technology.  Mr. Mehra holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.

On information and belief, Mehra is a citizen of California.

17.   Chopra, Mehra, Ballhaus, Feinberg, Good and Luskin are collectively referred to as the "Individual Defendants."

**THE INDIVIDUAL DEFENDANTS' DUTIES**

18.   By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision

- 8 -

over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

(b)    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    refrain from wasting OSI's assets;

(d)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(e)    properly disclose all material information regarding the Company, required by applicable state and federal laws and/or their relevant duties, to OSI's shareholders.

**CONTROL, ACCESS, AND AUTHORITY**

20.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by OSI.

21.    Because of their advisory, executive, managerial, and directorial positions with OSI, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of OSI.

22.     Each of the Individual Defendants was the agent of each of the other defendants and of OSI, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

23.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

24.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:

(a)     the Company was improperly recording revenue, including the creation of non-existent revenue and booking revenue in the earlier period than it was earned;

(b)     as a result, OSI's revenue and financial results were overstated;

(c)     OSI's financial statements were not prepared in accordance with generally accepted accounting principles ("GAAP");

(d)     the Company lacked adequate internal and financial controls; and

(e)     as a result of the foregoing, OSI's financial statements were materially false or misleading at all relevant times.  In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

25.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false or misleading financial results based upon non-existent revenue or based on revenue that was improperly recorded in the earlier period than it was earned.

26.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment; and (b) disguise and misrepresent OSI's future business prospects.

27.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

28.     Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

///

# SUBSTATIVE ALLEGATIONS

## I.   OSI and the Rapiscan Product

29.   OSI, together with its subsidiaries, is a vertically-integrated designer and manufacturer of specialized electronic systems and components for "critical" applications.  OSI sell products and provide related services in diversified markets, including homeland security, healthcare, defense and aerospace.

30.   OSI has three operating divisions:

(a)   *the Security division*, which provides security and inspection systems, turnkey security screening solutions and related services;

(b)   *the Healthcare division*, which provides patient monitoring, diagnostic cardiology and anesthesia systems; and

(c)   *the Optoelectronics and Manufacturing division*, which provides specialized electronic components and electronic manufacturing services for the Security and Healthcare divisions, as well as to external original equipment manufacturer clients for applications in the defense, aerospace, medical and industrial markets, among others.

31.   According to OSI's 2013 Annual Report on Form 10-K, which was signed by all Individual Defendants, the Security division, and particularly the Rapiscan machines are of critical importance to OSI:

> Through our Security division, we design, manufacture, market and service security and inspection systems under the "Rapiscan Systems" trade name.  Rapiscan Systems products fall into four categories—baggage and parcel inspection; cargo and vehicle inspection; hold (checked) baggage screening; and people screening.  They are used to search for weapons, explosives, drugs and

> other contraband as well as for the safe, accurate
> and efficient verification of cargo manifests for the
> purpose of assessing duties and monitoring the
> export and import of controlled materials.

32.     In fiscal 2012, the Security Division revenues amounted to $391.8 million, or approximately 49% of our revenues.  This is by far the largest division at OSI.  The Rapiscan division is so important that OSI's Form 10-K contains a specific risk disclosure regarding its importance to the Company:

> Sales of security and inspection systems and
> turnkey security screening solutions often depend
> upon the decision of governmental agencies to
> upgrade or expand existing airports, border crossing
> inspection sites, seaport inspection sites, military
> facilities and other security installations.  In the case
> of turnkey security screening solutions, the
> commencement of screening operations may be
> dependent on the approval, by a government
> agency, of the protocols and procedures that our
> personnel are to follow during the performance of
> their activities.

33.     Given the fact that the Security Division represents approximately half of OSI's revenues, it is no surprise that Rapiscan-related issues would be of vital interest to the Company and its shareholders.

## II.     October 23, 2012 Conference Call

34.     On October 23, 2012, the Individual Defendants hosted a conference call for analysts and investors to discuss OSI's earnings and prospects.  During the question and answer session of the conference call, Defendant Chopra and non-parties Alan Edrick (Executive Vice President and CFO) and Victor Sze (Executive Vice President, General Counsel and Corporate Secretary) participated in the call with outside analysts.

Defendant Chopra highlighted the Rapiscan business in his opening comments:

> ***Within the highlights for the quarter starting with our Security division, Rapiscan revenue has increased 14% to $83 million***.  During the quarter, we had many key accomplishments that should serve as seats for future growth.
>
> Highlighting few of these activities, Rapiscan's 620 Dual View baggage and parcel inspection system received the European Standard 2 approval for threat detection of liquid explosives.  The 620 DV can differentiate between threatening and benign liquids.
>
> ***I should note here that the 620 DV has also been approved for use by the UK's Department of Transport and the TSA in the U.S. for both aviation checkpoint screening and air cargo screening***.  As mentioned earlier, we have the broadest product portfolio for air cargo screening compared to any of our competitors.
>
> 620 ***DV's*** are in other applications also such as military checkpoints, customs, and boarder security.  620 DV is a part of a board portfolio of checkpoint screening solutions that we provide our customers to secure aviation and other critical or structure security.

[Emphasis added.]

35.    In the months preceding this call, OSI's stock traded steadily between approximately $70 and $80 per share.

## III.    November 14, 2012 Bloomberg Article

36.    On November 14, 2012, after the market closed, Bloomberg News reported that Congressman Mike Rogers, Chairman of the House

Transportation Security Subcommittee sent a letter dated November 13, 2012 to Transportation Securities Administration chief John Pistole saying that a supplier of passenger- scanning machines in United States airports "may have attempted to defraud the government by knowingly manipulating an operational test" by falsifying tests of software intended to stop the machines from recording graphic images of travelers.  The article by Bloomberg News further disclosed the following:

> OSI Systems Inc. (OSIS)'s Rapiscan unit, one of two suppliers of body-scanning machines in U.S. airports, may have falsified tests of software intended to stop the machines from recording graphic images of travelers, a U.S. lawmaker said.
>
> **_The company "may have attempted to defraud the government by knowingly manipulating an operational test,"_** Representative Mike Rogers, chairman of the House Transportation Security Subcommittee, said in a letter to Transportation Security Administration chief John Pistole Nov. 13. Rogers said his committee received a tip about the faked tests.
>
> Rapiscan, in a statement today, said it couldn't have manipulated testing because those processes were controlled by the government.  "At no time did Rapiscan falsify test data or any information related to this technology or the test," Peter Kant, an executive vice president with the company, said in an interview yesterday.
>
> While Rogers' letter doesn't identify the company, his spokesman, Shea Snider, confirmed in an e-mail that he was referring to Rapiscan.
>
> OSI fell $22.97, or 30 percent, to $53.32 at 3:37 p.m., the biggest intraday decline since December 2000. More than 4.4 million shares had changed hands, about 40 times the three-month daily average.

The TSA accelerated the use of advanced scanners in 2010, following the Dec. 25, 2009, attempt by Umar Farouk Abdulmutallab to blow up a Northwest Airlines flight by igniting explosives in his underpants. It's used two vendors: Rapiscan, whose backscatter machines use a form of X-rays, and L-3 Communications Holdings Inc., (LLL) which features another imaging technology known as millimeter-wave.

Airline passengers were offended by the revealing images, including those of children and the elderly, and the TSA moved its screens to separate rooms away from the checkpoints so the scans couldn't be seen by the public. If TSA agents spot an image that looks like a weapon or an explosive, they communicate by radio with screeners at the security lines about where to search.

The Electronic Privacy Information Center sued the agency, calling use of the machines the equivalent of a "physically invasive strip search."

Rapiscan has been trying, without success, to write software that would display a generic image.  L-3 has been able to produce such software.

TSA has said passengers who don't want to go through the scanners can opt for a pat-down instead.  That option has also generated criticism from the public and members of Congress as being excessively invasive.

The European Union banned backscatter machines in November 2011, citing health risks from low doses of radiation.  TSA says the machines expose passengers to less radiation than they receive from the atmosphere during a flight.

If wrongdoing is proven on the government contracts, Rapiscan could face fines, prison terms and a ban on government contracting, said Dan Gordon, former head of federal procurement for President Barack Obama's administration.

- 16 -

***"Fake test results are incredibly serious,"*** ***said Gordon, now a dean at George*** ***Washington University Law School in*** ***Washington.  "Every false statement is a*** ***criminal act, sending someone in that*** ***company to jail."***

TSA relied on a third-party vendor rather than Rapiscan to verify the technology, so the agency may be attempting to find a scapegoat for a poorly managed program, Rogers said at a hearing today.

The Alabama Republican, who has oversight of TSA operations, said the agency first indicated it was moving Rapiscan machines to smaller airports, then couldn't produce a list of airports. The agency is moving 91 units worth $14 million to a warehouse instead of redeploying them, Rogers said.

The TSA has 174 backscatter machines, David Castelveter, a TSA spokesman, said.

"It appears we not only have a technology problem, but a significant transparency problem on our hands," Rogers said.

The TSA intends to keep the machines in a warehouse until the privacy-protection software works, John Sanders, assistant administrator for the agency's office of security capabilities, said at the hearing.

Sanders said the agency doesn't have evidence that tests on the backscatter machines were manipulated.

"At this point we don't know what has occurred," Sanders said.  "We are in contact with the vendor. We are working with them to get to the bottom of it."

TSA has spent about $40 million on backscatter machines to date, Sanders said.  It has spent about $100 million on 600 millimeter-wave machines.

Kant said Rapiscan received a so-called show-cause letter from the TSA on Nov. 9 seeking detailed

information about the testing of technology used in the machines.

***Rapiscan became aware of an issue related to software under development months ago and promptly notified the TSA, Kant said.*** The company is fully cooperating with the agency's investigation, which doesn't relate to software that detects anomalies on passengers' bodies, Kant said. Passenger safety was never affected, he said.

Show-cause letters are sent when the government believes a contractor isn't complying with terms, said Gordon, the former federal procurement administrator.  It's a last chance for the company to demonstrate it hasn't violated the contract, he said.

Show-cause letters are rare because most contractors try hard to meet the government's requirements, Gordon said.  Companies that default on contracts may have a difficult time winning business again from that agency or other parts of the government, he said.

The TSA recently said it was relocating Rapiscan machines from seven larger, busier airports to smaller ones.

The change related to extra time it takes for passengers to be scanned with the backscatter machines, not any doubts about whether the technology works, Pistole told reporters at a news conference in Washington Nov. 13.  Backscatter machines require staff in a separate room to look at the images and radio back to an officer at the checkpoint if extra screening is needed, he said.

TSA believes backscatter technology is still effective in finding non-metallic objects, Pistole said.

"We originally went with two companies to help drive competition and try to get to the next level of detection with the best possible performance," Pistole said.  "We're still committed to doing that."

1
2

> TSA has contracted for increasing levels of detection and other efficiency and privacy enhancements, Castelveter said in a statement yesterday.

3
4
5

> "We fully expect our vendors to deliver on their commitments, and are working with them to that end within the federal contracting process," Castelveter said.

6

[Emphasis added.]

7
8
9
10
11
12
13

   37.   The market's reaction to this news was swift.  OSI common stock closed at $76.29 on November 14, 2012, the trading day prior to this news article.  The following day, OSI common stock plummeted approximately 30% to close at $54.89 on a volume of more than 4.4 million shares traded.  This was approximately 40 times the trailing three month daily average volume and represented a market cap loss of more than $100 million.

14
15
16

   38.   The Individual Defendants responded by issuing a press release on November 15, 2012, which was filed with the SEC on Form 8-K (signed by non-party Alan Edrick):

17
18
19
20
21
22
23
24
25
26

> OSI Systems, Inc. (NASDAQ: OSIS), a vertically-integrated provider of specialized electronics and services, announced today that on November 9, 2012 Rapiscan Systems, its Security division, was delivered a show cause letter from the U.S. Transportation Security Administration (TSA).  The letter, which pertains to a privacy system Rapiscan was developing under contract for the TSA, alleges that Rapiscan did not disclose issues related to the development process in a timely or complete manner.  Contrary to some press reports, Rapiscan did not falsify test data; in fact, TSA testimony to Congress today confirms that this was at all times a government controlled test and that Rapiscan could not have manipulated any test data.

27

        \*      \*      \*

28

- 19 -

> Furthermore, the evidence shows that Rapiscan delivered for testing the exact configuration previously disclosed to TSA and which TSA had approved.  "At no time did Rapiscan Systems falsify test data or engage in any fraudulent conduct," OSI Systems President and CEO, Deepak Chopra, commented.  "We take the matter very seriously and are fully cooperating with the TSA during this process."

## IV.   January 24, 2013 Conference Call

39.   Defendant Chopra gave short shrift to this issue with Rapiscan in the next regularly scheduled call with analysts on January 24, 2013, attended by Chopra and non-parties Alan Edrick and others:

> First as you know Rapiscan Systems received a show cause letter from the TSA in November.  We believe we have clarified all of the questions in the show cause letter to TSA.  The final resolution of the show cause letter is subject to final disposition by the Department of Homeland Security and the company is currently working diligently to complete that process.

## V.   June 21, 2013 8-K

40.   On June 21, 2013, the Individual Defendants caused to be filed with the SEC a Form 8-K (signed by non-party Victor Sze), disclosing:

> On June 21, 2013, OSI Systems, Inc. subsidiaries Rapiscan Systems, Inc. and Rapiscan Government Services, Inc. (collectively, "Rapiscan") entered into a 30-month Administrative Agreement (the "Agreement") with the Department of Homeland Security ("DHS").  The Agreement resolves the May 17, 2013 DHS Notice of Proposed Debarment and automatic suspension of Rapiscan that became effective May 20, 2013.  ***Rapiscan can continue its current and future business with United States federal government agencies.***

> ***Pursuant to the terms of the Agreement, Rapiscan has agreed to certain compliance upgrades and organizational improvements, including maintenance of a robust compliance program.  Rapiscan has also made certain personnel changes and has created additional positions dedicated to government contracting compliance and administration, corporate compliance, and quality assurance.*** Further, for the duration of the term of the Agreement, Rapiscan has agreed to the continued review of its compliance and ethics program, including the retention by Rapiscan of an independent consultant to perform semi-annual assessments of its compliance policies, procedures, and practices.  Rapiscan has also agreed to additional DHS reporting requirements.

[Emphasis added.]

41.     With Defendant Chopra's assurances that OSI was "working" to remedy the issues TSA had with Rapiscan, and with the above Form 8-K's statement that Rapiscan would "continue its current and future business with the United States federal government," OSI's stock price gradually recovered from the massive decline.  By July 23, 2013, OSI's stock price had risen above $70 per share.  However, the problems with Rapiscan, Rapiscan management, and related internal controls were not solved.

## VI.     December 6, 2013 Form 8-K

42.     On December 6, 2013, the Individual Defendants caused to be filed with the SEC a Form 8-K (signed by non-party Alan Edrick), which stated:

> On December 5, 2013, OSI Systems, Inc. announced that its security division subsidiary, Rapiscan Systems, Inc. ("Rapiscan") was notified by the U.S. Transportation Security Administration (TSA) that a delivery order placed with Rapiscan on September 26, 2013 for Advanced Technology X-Ray (AT-2)

- 21 -

based systems was being terminated for default.  As a result, the Company has de-booked this order which had a value of approximately $60 million.

43.   Shortly thereafter, on December 9, 2013, *Bloomberg News* published an article which discussed these additional problems with Rapiscan and TSA's abrupt cancellation of a $60 million order.   The article by *Bloomberg News* further disclosed the following in relevant part:

> OSI Systems Inc. (OSIS:US) fell (OSIS:US) as much as 40 percent, the biggest intraday drop ever, after lawmakers said the company may face a ban on U.S. contracts for using unapproved Chinese-made parts in baggage-screening equipment.
>
> The disclosure came after the Transportation Security Administration canceled a $60 million order last week.  The TSA has resumed an effort to bar OSI's Rapiscan Systems unit from future contracts, Representatives Michael McCaul, a Texas Republican, and Bennie Thompson, a Mississippi Democrat, said in a letter dated Dec. 6.
>
> "TSA has strict requirements that all vendors must meet for security effectiveness and efficiency and does not tolerate any violation of contract obligations," David Castelveter, a spokesman, said in an e-mail.  "TSA is responsible for the safety and security of the nearly two million travelers screened each day."
>
> Shares fell (OSIS:US) 26.8 percent to $47.38 at 4 p.m. in New York. Earlier, they were at $39.00, lowest since October 2011.  Trading volume was 7.94 million shares, 60 times the three-month average.
>
> OSI's security division, which includes its work for the TSA, generated 46 percent of the company's revenue in the last fiscal year, according to a 10-K filing dated Aug. 16.

- 22 -

The contract raises questions about whether the unapproved component made the Rapiscan machines vulnerable to sabotage or espionage, the lawmakers said.  The House Homeland Security Committee, as part of a congressional investigation, asked the TSA for documents relating to communications between the company and the government.

Ajay Vashishat, OSI Systems' vice president for business development, didn't respond to an e-mail and phone call seeking comment.

A part in the machines made under the canceled contract was manufactured in China, OSI Systems said in a news release today explaining why the TSA ended an order signed less than three months ago.

OSI Systems, based in Hawthorne, California, said the company didn't get TSA's approval for the part, violating its contract. The part made by Shanghai Advanced Non-Destructive Testing was "effectively an X-ray light bulb" and didn't contain software, Chief Executive Officer Deepak Chopra said in the statement.

TSA is in the process of completing a thorough review in advance of a final decision on proceeding with debarment, Castelveter said.  The agency will respond directly to the lawmakers, he said.

The equipment in the canceled contract isn't used to physically screen passengers, Castelveter said.  The agency hasn't identified any degradation of security or impact on operational performance from the Rapiscan violations, he said.

Rapiscan averted debarment by the Department of Homeland Security last year over accusations it misled the TSA about testing of updated body-

- 23 -

scanning machines.  The company, in its 10-K, said Homeland Security could start debarment proceedings again if Rapiscan failed to live up to an agreement signed in June.

OSI had hundreds of the body-scanning machines removed from U.S. airports earlier this year after the TSA concluded the company couldn't meet a congressional deadline to make their revealing images more generic.

The company in June agreed with Homeland Security officials to hire new executives and reassign five senior managers. Rapiscan denied accusations by Representative Mike Rogers, an Alabama Republican, that it fabricated software tests.

Since fiscal 2009, OSI Systems has received $463 million in U.S. government contracts, according to data compiled by Bloomberg.  The company received $267 million in Department of Homeland Security work over the same period.

44.    The market's reaction to this news was significant.  OSI common stock closed at $71.72 on December 5, 2013.  By December 9, 2013, OSI stock was down to $47.38, or more than 40%.

45.    Accordingly, the Company has been damaged.

**VII.  Insider Trading**

46.    Based on the material, non-public information that OSI had serious, ongoing problems relating to its Rapiscan machines and the TSA, several Board members sold OSI common stock while at or near record high prices:

///

///

///

| Name | Title | Trade Date | Shares Sold | Sale Price | Gross Proceeds |
|---|---|---|---|---|---|
| Defendant Deepak Chopra | President and CEO, Board member | 9/10/12 | 5,198 | $74.25 | $385,952 |
| | | 9/4/12 | 15,196 | $73.79 | $1,121,313 |
| | | 8/14/12-8/15/12 | 45,681 | $73.43 | $3,354,356 |
| | | | | TOTAL: | $4,861,621 |
| | | | | | |
| Defendant Ajay Mehra | Rapiscan President and Board Member | 9/6/12 | 3,750 | $73.88 | $277,050 |
| | | 9/5/12 | 5,997 | $73.91 | $443,238 |
| | | 8/16/12 | 27,053 | $73.43 | $1,986,502 |
| | | | | TOTAL: | $2,706,790 |
| | | | | | |
| Defendant Steven Good | Board Member | 8/30/12 | 1,000 | $73.50 | $73,500 |
| | | 8/14/12 | 5,437 | $73.79 | $401,196 |
| | | | | TOTAL: | $474,696 |
| | | | | | |
| | | Grand Total: | 109,312 | | $8,043,107 |

47.     These stock sales are particularly egregious given that Defendants admitted that they were aware of the ongoing issues with the Rapiscan devices "months" before they were "outed" by *Bloomberg News* on November 14, 2012.  The sales above are all within two months of this disclosure and the huge, 30% drop in OSI's stock price.  The above three

Board members had access to this inside information, yet nevertheless sold more than one-hundred thousand shares of stock for proceeds of more than $8 million. If these defendants had waited until the material, inside information was known, their sales would have netted them millions less than they received.

48.   As a result, Defendants Chopra, Mehra, and Good have been unjustly enriched through their breaches of fiduciary duties.

### DAMAGES TO OSI

49.   OSI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

50.   As a direct and proximate result of the Individual Defendants' misconduct, OSI has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)   legal fees associated with the lawsuits filed against OSI for violations of the federal securities laws;

(b)   loss of reputation and goodwill, and a "liar's discount" that will plague OSI's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c)   amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations; and

(d)   loss of revenues and profits.

///
///
///
///
///
///

- 26 -

## DERIVATIVE AND DEMAND ALLEGATIONS

51.     Plaintiff brings this action derivatively in the right and for the benefit of OSI to redress the breaches of fiduciary duties and other violations of law by the Individual Defendants.  OSI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

52.     Plaintiff will adequately and fairly represent the interests of OSI and its shareholders in enforcing and prosecuting its rights.

53.     Plaintiff is and was an owner of OSI common stock during the Relevant Period when Individual Defendants' wrongful course of conduct alleged herein occurred, and remains a stockholder of the Company

54.     At the time this complaint was filed, the Board consisted of the following six individuals:  Defendants Chopra, Ballhaus, Feinberg, Good, Luskin and Mehra.

55.     Because of their Board membership and/or executive positions with the Company, the Individual Defendants had access to the undisclosed information about OSI's ongoing issues with its Rapiscan machines and the related issues with its TSA contracts.

56.     The Individual Defendants face a substantial likelihood of personal liability in this action, *inter alia*:

(a)     as a result of their failure, as directors and/or officers of OSI, to assure that a reliable system of internal controls was in place and functioning effectively;

(b)     for their failure to assure that a reliable disclosure system was in place and functioning effectively;

(c)     for their violations of federal securities laws; and

(d)     for their illicit insider trading proceeds.

- 27 -

57.     The Board was on notice that TSA had raised serious issues with OSI's Management, violations of contractual provisions, and legal violations relating to acquiring equipment from non-approved countries. Moreover, the Individual Defendants failed to take the necessary steps to prevent and/or remedy those deficiencies, proximately causing millions of dollars in damages to the Company.

58.     A true and correct copy of the original complaint was delivered to the Company by Plaintiff before its filing with this Court.

59.     Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the following reasons:

## I.     Defendant Chopra Is Not Independent

60.     Demand is excused as to Chopra because he has served as OSI's President and CEO, pursuant to which he has received substantial monetary compensation and other valuable benefits.  Based thereupon, OSI's own disclosures (including OSI's 2013 Proxy Statement filed on October 15, 2013) admit Chopra's lack of independence:

> The Board of Directors has determined that each of the directors, except Mr. Chopra and Mr. Mehra, is independent within the meaning of the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and director independence standards of The NASDAQ Stock Market (the "Listing Standards"), as currently in effect.

61.     Accordingly, demand is excused as to Chopra.

## II.    Defendant Mehra Is Not Independent

62.     Demand is excused as to Mehra because his principal professional occupation is his employment with OSI as President of its Rapiscan division, pursuant to which he received and continues to receive

substantial monetary compensation and other valuable benefits.  Similar to Chopra, Defendant Mehra lacks independence based upon NASDAQ director independent standards.

63.   Accordingly, demand is excused on defendant Mehra.

## III.   Defendants Chopra, Mehra, and Good Face a Substantial Likelihood of Personal Liability and Are Not Disinterested

64.   As a result of the actions complained of herein, Chopra, Mehra, and Good each received a material financial benefit that was not shared by OSI's shareholders in that they were able to reap significant profits through the misuse of non-public Company information to which they were privy as a result of their positions as fiduciaries of the Company.

65.   Defendants Chopra, Mehra, and Good sold large quantities – approximately 109,312 shares – of OSI stock based on the material information that OSI had serious and significant problems with the Rapiscan division, including its problems with the TSA contract.  The illicit profits reaped by Chopra, Mehra, and Good were a direct result of OSI's inflated stock price due to the undisclosed problems described herein. When this information became public, OSI's stock price fell precipitously.

66.   Because Chopra, Mehra, and Good each received significant pecuniary benefits from their wrongdoing, they are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action without being influenced by their overriding personal interest.

67.   Accordingly, demand is futile and excused as to Chopra, Mehra, and Good.

///

///

## IV.   Demand Is Futile for the Audit Committee Defendants

68.   During the Relevant Period, Ballhaus, Good, and Luskin served as members of the Audit Committee, which is charged with reviewing OSI's financial statements and internal controls.  Specifically, the Audit Committee Charter requires Ballhaus, Good, and Luskin to:

(a)   "Review with the Company's management, internal auditors and independent auditors the Company's accounting and financial reporting controls."

(b)   "Obtain annually in writing from the independent auditors their letter as to the adequacy of such controls."

(c)   "Review with the Company's management, internal auditors and independent auditors significant accounting and reporting principles, practices and procedures applied by the Company and management's judgments and estimates in preparing its financial statements."

(d)   "Discuss with the independent auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles used in financial reporting."

69.   However, Ballhaus, Good, and Luskin breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee allowed the internal control deficiencies described herein to occur.

70.   Ballhaus, Good, and Luskin have been responsible for and/or failed to rectify OSI's ongoing internal control issues, even when given notice from the TSA regarding a remediation plan.  Despite these red flags, the Audit Committee members failed to correct these ongoing issues.  The actions of defendants Ballhaus, Good and Luskin are so far removed from the standard of care required of any director, but particularly of an Audit Committee that demand upon them is excused.

**V.    Defendants Feinberg and Luskin Have Interconnected Personal and Professional Relationships and Thus Cannot Independently Consider a Demand**

71.    Defendants Feinberg and Luskin both have extensive ties to the UCLA Health System.  Defendant Feinberg serves as the President and CEO of UCLA Hospital.  Defendant Luskin is a director of the UCLA Foundation and serves on the Board of the Santa Monica – UCLA Medical Center and Orthopedic Hospital. During the Relevant Period, defendant Luskin donated 50,000 shares to UCLA for proceeds of more than $4 million.

72.    As a result of these longstanding professional relationships among themselves, defendants Feinberg and Luskin are incapable of bringing suit against each other on behalf of the Company.

73.    Accordingly, demand on Feinberg and Luskin is futile and excused.

**VI.   All Individual Defendants Face a Substantial Likelihood of Liability for Causing OSI to Disseminate False and Misleading Information**

74.    The Individual Defendants were responsible for reviewing and approving the Company's financial statements.  By authorizing the false financial statements and public statements set forth above, the Individual Defendants were active participants in breaches of candor and duty, and have subjected the Company to, among other things, lawsuits claiming violations of the federal securities laws.

75.    A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon the Individual Defendants to bring suit against themselves would be a useless and futile act.

76.    Because the Security division generates over half of OSI's revenues, and because Rapiscan systems are vital to the Security division's success, Rapiscan systems are OSI's "core product."  The Individual

1  Defendants were charged with the knowledge of the Rapiscan-related

2  issues.

3       77.    The Individual Defendants' knowing or reckless breaches of

4  fiduciary duty constitute bad faith under Delaware law.  Bad-faith conduct

5  is not protected under the business judgment rule.  Thus, all Individual

6  Defendants face a substantial likelihood of liability.  Demand is thus futile

7  and excused.

8  **VII.  Demand Is Futile for Additional Reasons**

9       78.    OSI's officers and directors are protected against personal

10  liability for their acts of mismanagement and breach of fiduciary duty

11  alleged in this complaint by directors' and officers' liability insurance,

12  which they caused the Company to purchase for their protection with

13  corporate funds, *i.e.*, monies belonging to the stockholders of OSI.

14  However, the directors' and officers' liability insurance policies covering the

15  Individual Defendants contain provisions that eliminate coverage for any

16  action brought directly by OSI against these defendants, known as the

17  "insured versus insured exclusion."

18       79.    As a result, if the Individual Defendants were to sue themselves,

19  there would be no directors' and officers' insurance protection.  Thus, the

20  Individual Defendants will not bring such a suit.  On the other hand, if the

21  suit is brought derivatively, as this action is brought, such insurance

22  coverage exists and will provide a basis for the Company to effectuate a

23  recovery.

24       80.    Accordingly, demand on the Individual Defendants is futile, and

25  therefore, excused.

26  ///

27  ///

28

**COUNT I**
**Breach of Fiduciary Duties**
**for Disseminating False and Misleading Information**
**(Against All Defendants)**

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that OSI disseminated accurate, truthful and complete information to its shareholders.

83.     The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to OSI shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

84.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**Breach of Fiduciary Duties**
**for Failing to Maintain Adequate Internal Controls**
**(Against All Defendants)**

85.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

86.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that OSI's financial statements were prepared in accordance with GAAP and relevant SEC regulations, and, when put on notice of problems with OSI's

business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

87.     The Individual Defendants willfully ignored the obvious and pervasive problems with OSI's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

88.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### Unjust Enrichment
### (Against Chopra, Mehra, and Good)

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     By their wrongful acts, Chopra, Mehra, and Good were unjustly enriched at the expense of and to the detriment of OSI and it would be unconscionable to allow them to retain the benefits of their illegal conduct. These defendants were unjustly enriched by their receipt of proceeds from their illegal sales of OSI common stock, as alleged herein.

91.     Plaintiff, as a shareholder of OSI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all proceeds obtained by Chopra, Mehra, and Good, and each of them, as a result of their wrongful conduct and breaches of fiduciary duties.

92.     As a result of Chopra, Mehra, and Good's unjust enrichment, OSI has been injured and is entitled to damages.

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing OSI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to OSI's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to OSI restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

///
///
///
///

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 15, 2014                    Respectfully submitted,

                                          BOTTINI & BOTTINI, INC.
                                          Francis A. Bottini, Jr. (SBN 175783)
                                          Yury A. Kolesnikov (SBN 271173)


                                          s/ Francis A. Bottini, Jr.
                                          ―――――――――――――――――――
                                          Francis A. Bottini, Jr.

                                          7817 Ivanhoe Avenue, Suite 102
                                          La Jolla, California  92037
                                          Telephone:   (858) 914-2001
                                          Facsimile:    (858) 914-2002

                                          THE SHUMAN LAW FIRM
                                          Kip B. Shuman
                                          kip@shumanlawfirm.com
                                          Rusty E. Glenn
                                          rusty@shumanlawfirm.com
                                          885 Arapahoe Avenue
                                          Boulder, Colorado  80302
                                          Telephone:   (303) 861-3003
                                          Facsimile:    (303) 484-4886

                                          *Counsel for Plaintiff Marc Hagan*

## VERIFICATION

I, Marc Hagan, verify that I am a shareholder of Nominal Defendant OSI Systems, Inc. (the "Company"). I have reviewed the allegations made in this Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 4, 2014

_____
Marc Hagan