SCOTT+SCOTT, ATTORNEYS AT LAW LLP
John T. Jasnoch (281605)
jjasnoch@scott-scott.com
655 North Central Ave., 17th Floor
Glendale, California 91203
Telephone: (213) 985-1274
Facsimile: (213) 985-1278

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Co-Lead Counsel for Plaintiffs*

[Additional counsel listed on the signature page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| IN RE: OSI SYSTEMS, INC. DERIVATIVE LITIGATION | Lead Case No. 2:14-cv-02910-MWF (VBKx) |
| This Document Relates To: | **Derivative Action** |
| ALL ACTIONS | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

1

**TABLE OF CONTENTS**

2

NATURE OF THE ACTION ............................................................... 1

JURISDICTION AND VENUE .......................................................... 5

THE PARTIES .................................................................................... 6

    I.    Plaintiffs .......................................................................... 6

    II.   Nominal Defendant ........................................................ 6

    III.  The Individual Defendants ............................................ 6

THE INDIVIDUAL Defendants' Duties........................................... 11

COMMITTEES OF OSI'S BOARD AND ACCOMPANYING DUTIES ......... 14

    I.    Duties of the Audit Committee Members................................. 15

    II.   Duties of the Compensation Committee Members .................. 16

    III.  Duties of the Nominating and Governance Committee
          Members .................................................................... 16

CONTROL, ACCESS, AND AUTHORITY CONSPIRACY, AIDING
    AND ABETTING, AND CONCERTED ACTION................................ 17

SUBSTANTIVE ALLEGATIONS ....................................................... 19

    I.    OSI and the Rapiscan Product............................................... 19

    II.   The Individual Defendants Cause OSI to Fail to Upgrade
          Critical Software and to Manipulate Testing........................... 25

    III.  Rapiscan Uses Unapproved Chinese Parts in Its Baggage-
          Screening Machines ........................................................... 39

    IV.  False and Misleading Statements ............................................ 48

    V.   OSI's Board Knew that It Was Not Doing Its Job ................. 54

    VI.  Accounting Violations ........................................................... 60

          A.    Failure to Properly Account for the Material
               Charges Associated with the Wrongdoing ...................... 61

i

B.      Additional GAAP and SEC Violations ..............................75

VII.    Insider Trading ...............................................................82

DAMAGES TO OSI ..................................................................................84

DERIVATIVE AND DEMAND ALLEGATIONS.........................................85

I.      Defendant Chopra Is Not Independent.....................................87

II.     Defendant Mehra Is Not Independent .....................................88

III.    Defendants Chopra, Mehra, and Good Face a Substantial
        Likelihood of Personal Liability and Are Not Disinterested....88

IV.     Demand Is Futile for the Audit Committee Defendants...........90

V.      The Individual Defendants Have Interconnected Personal
        and Professional Relationships and Thus Cannot
        Independently Consider a Demand...........................................91

VI.     All Individual Defendants Face a Substantial Likelihood
        of Liability Because They Had Actual Knowledge of — or
        Recklessly Disregarded — the Material Undisclosed Facts ......92

VII.    All Individual Defendants Face a Substantial Likelihood
        of Liability for Causing OSI to Disseminate False and
        Misleading Information............................................................95

VIII.   Demand Is Futile for Additional Reasons ................................96

COUNT I....................................................................................................97

COUNT II ..................................................................................................97

COUNT III.................................................................................................98

PRAYER FOR RELIEF.............................................................................99

DEMAND FOR JURY TRIAL ................................................................100

Plaintiffs Marc Hagan and the City of Irving Supplemental Benefit Plan ("Plaintiffs") bring this action on behalf of Nominal Defendant OSI Systems, Inc. ("OSI" or the "Company") against the six members of OSI's Board of Directors (the "Board"), asserting claims for breaches of fiduciary duties (Counts I and II) and unjust enrichment (Count III).  Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.  Plaintiffs' information and belief are based upon their counsel's investigation, which included, among other things, a review of publicly available documents and information regarding Defendants and OSI, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OSI, analysts' reports and advisories about OSI, and documents obtained pursuant to 8 *Del. Code* §220 (the "220 Demand").

### NATURE OF THE ACTION

1.     This stockholder derivative action concerns breaches of fiduciary duties by the Board and OSI's senior management from January 2012 to the present (the "Relevant Period").

2.     OSI is a Delaware corporation headquartered in Hawthorne, California, that designs and manufactures electronic systems and components for the homeland security, healthcare, defense, and aerospace markets.   OSI's core business segment is Rapiscan Systems, Inc. ("Rapiscan"), a developer and manufacturer of X-ray security systems that accounts for nearly half of OSI's annual revenue.  Among the Company's largest customers is the Transportation Security Administration (the "TSA"), which uses the Company's security imaging products in administering mandatory security checkpoints and passenger screenings in airports.

1

3.     During the Relevant Period, Defendants caused OSI to operate in an unlawful manner that resulted in the Company violating positive law with regard to Rapiscan and disseminating false and misleading information concerning the Rapiscan full body scanners and OSI's contracts with the TSA.

4.     Specifically, during the Relevant Period, Defendants caused the Company to:  (1) manipulate an operational test of its Advanced Imaging Technology ("AIT") by selectively picking the best sensors, which caused the test not to be representative of the scanners deployed at airports; (2) manufacture products that directly violated the Company's contracts with the TSA; and (3) make false and misleading statements and omissions about the Company's finances and business prospects.

5.     Furthermore, when the AIT scanners were first deployed, there was a public outcry regarding the highly detailed images produced by these machines.  The TSA hired OSI to modify its software for operating the machines so the display would appear more generic.  However, because of these machines' hardware, specifically the tubes that provided the scanned image, OSI could not timely create the software requested by the TSA. Again, OSI selectively picked only certain machines to show the TSA, in an effort to mislead the TSA into believing that a solution to these software issues was close.

6.     Defendants' misconduct, specifically their failure to implement and maintain adequate internal controls, led to the cancellation of more than $60 million in contracts with the TSA and the endangerment of further business with the federal government.  Thus, on January 18, 2013, the TSA reported that it had terminated its AIT contract with the Company and that OSI would be required to bear the costs of removing Rapiscan body scanners from airports, because the TSA concluded that the Company

1    could not meet a Congressional deadline to produce generic passenger
2    images instead of images that invade the privacy of passengers.

3        7.    On May 20, 2013, OSI reported that the Department of
4    Homeland Security (the "DHS") issued a "Notice of Proposed Debarment"
5    to the Company (the "Notice"), which if implemented would bar OSI from
6    contracting with the federal government.  The Notice alleged that OSI failed
7    to disclose a defect with its AIT products and replaced hardware without
8    being granted proper governmental approval.  On June 21, 2013, to avoid
9    debarment, OSI entered into an Administrative Agreement with the DHS,
10   pursuant to which the Company was forced to, among other things, hire an
11   outside consultant to conduct an independent assessment of its internal
12   controls, ethics, and compliance functions.

13       8.    Unsurprisingly, the assessment of OSI's internal controls
14   showed that Defendants were not doing their job and knowingly abdicated
15   their responsibility to manage the Company.  A report dated September 18,
16   2013 (the "Report") revealed major holes in the Company's oversight and
17   compliance reporting procedure, including the following:

18       a.    the Company did not even have a dedicated compliance
19           officer until May 2013, and, as of October 2013, the compliance
20           officer had never met with OSI's Board or the Company's Chief
21           Executive Officer ("CEO") and had not been included in senior or
22           executive management meetings;

23       b.    although the Board delegated responsibility for oversight
24           of compliance to the Audit Committee of the Board, the charter for
25           that committee was "vague" and the Audit Committee failed to meet
26           with OSI's compliance director even after that position was created
27           following the Company's near debarment;

28

3

c.      the Company did not even have a separate budget to fund its Ethics and Compliance Program;

d.      the Company lacked an independent formal compliance structure that complied with the federal regulations;

e.      the Company's Code of Ethics entirely failed to address the subjects of government contracting and anti-corruption; and

f.      although required by federal regulations to assess the risk of misconduct and criminal activity, the Company did not currently have a formal process in place to assess the risk of misconduct or criminal conduct in the organization.

9.      Plaintiffs' investigation confirms that the Board utterly failed to exercise proper oversight of the Company.   Specifically, a shareholder inspection demand pursuant to 8 *Del. C.* §220 revealed that, for almost one year, between January 1, 2012 and November 15, 2012, there is no evidence that the Board did anything to monitor the risk that Rapiscan was not in compliance with the law.

10.      Incredibly, three of the six members of the Board sold hundreds of thousands of shares of OSI stock before this material information was made public, and while OSI stock was trading at artificially inflated prices. These three Board members received over $8 million from these sales. After these Board members unloaded their OSI stock, and once this information was made public, OSI's stock price fell precipitously.

11.      As a result of Defendants' wrongdoing, the Company has suffered substantial damage.   This shareholder derivative action seeks to recover damages and obtain injunctive relief on OSI's behalf.

4

## JURISDICTION AND VENUE

12.     Subject matter jurisdiction is conferred by 28 U.S.C §1332. Complete diversity exists among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.   Moreover, the Court has personal jurisdiction over each Defendant because each Defendant has committed acts within this District and/or directed acts at this District, which are related to the claims at issue in this complaint.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because:

        a.     OSI maintains its principal place of business in this District;

        b.     one or more of the Individual Defendants either resides or maintains executive offices in this District;

        c.     a substantial portion of the transactions and wrongs set forth below, including the Individual Defendants' primary participation in the wrongful acts, occurred in this District; and

        d.     the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

# THE PARTIES

## I.   Plaintiffs

15.   Plaintiff Marc Hagan ("Hagan") is a current shareholder of OSI and has continuously held OSI stock since 2007.  Plaintiff Hagan is a citizen of Washington.

16.   Plaintiff City of Irving Supplemental Benefit Plan ("City of Irving") is a retirement benefit plan of the City of Irving, Texas, a home-rule municipality of the State of Texas.  Plaintiff City of Irving is a current shareholder of OSI and has continuously held OSI stock since February 29, 2012.  Plaintiff City of Irving is a citizen of Texas.

## II.   Nominal Defendant

17.   Nominal Defendant OSI Systems, Inc. is a Delaware corporation, with its principal executive offices at 12525 Chadron Avenue, Hawthorne, California.  OSI produces specialized electronic systems and components used in the homeland security, defense, aerospace, and healthcare industries.  The Company was founded in May 1987.  OSI's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "OSIS."  OSI is a citizen of California and Delaware.

## III.   The Individual Defendants

18.   Defendant Deepak Chopra ("Chopra") founded OSI, currently serves as Chairman and CEO, and has been a director of OSI since 1992. He also serves as CEO of the Company's major subsidiaries.  From 1976 to 1979 and from 1980 to 1987, Chopra held various positions with ILC Technology, Inc., a publicly traded manufacturer of lighting products, including serving as Chairman, CEO, President, and Chief Operating Officer ("COO") of its United Detector Technology division.  He has also held various positions with Intel Corporation, TRW Semiconductors, and RCA Semiconductors.  Chopra holds a Bachelor of Science degree in

Electronics and a Master of Science degree in Semiconductor Electronics. Chopra is the beneficial owner of 736,212 shares of OSI stock.  He was paid $8,290,270 in total executive compensation for the fiscal year ending June 30, 2013.   Upon information and belief, Chopra is a citizen of California.

19.    Defendant William F. Ballhaus, Jr. ("Ballhaus") has served on the OSI Board since May 2010.   He is a member of the Audit, Compensation, and Technology Committees.  From 2000 to 2007, Ballhaus served as President and then also as CEO of Aerospace Corporation. Between 1990 and 2000, his career included positions within the aerospace industry, including Corporate Vice President, Engineering and Technology for Lockheed Martin Corporation, and President, Aero and Naval Systems and President, Civil Space & Communications, both for Martin Marietta. Between 1971 and 1989, Ballhaus worked for NASA, including as Director of its Ames Research Center.   Ballhaus serves on the Board of Directors of Draper Laboratory.  He obtained a Ph.D. in Engineering in 1971 and a B.S. and M.S. in Mechanical Engineering in 1967 and 1968, all from the University of California at Berkeley.   Ballhaus is the beneficial owner of 10,000 shares of OSI stock.   He was paid $298,470 in total director compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Ballhaus is a citizen of California.

20.    Defendant David Feinberg ("Feinberg") has served on the OSI Board since March 2010.   He serves as Chair of the Nominating and Governance Committee.  Feinberg is also a member of the Technology Committee.  He has served as the President of the UCLA Health System since July 2011 and as CEO and Associate Vice Chancellor of the UCLA Health System since July 2007.   Prior to assuming these positions, Feinberg was the medical director of the Resnick Neuropsychiatric Hospital

(NPH) at UCLA.  He is a professor of clinical psychiatry in the David Geffen School of Medicine at UCLA.  Feinberg currently serves on the Board of Directors of Douglas Emmett, Inc., a publicly held Real Estate Investment Trust listed on the New York Stock Exchange.  He graduated *cum laude* in economics from the University of California, Berkeley in 1984 and graduated with distinction from the University of Health Sciences/The Chicago Medical School in 1989.  He earned his Master of Business Administration from Pepperdine University in 2002.  Feinberg is the beneficial owner of 10,010 shares of OSI stock.  He was paid $282,970 in total director compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Feinberg is a citizen of California.

21.    Defendant Steven C. Good ("Good") is a current director and has served on the Board since September 1987.  He serves as the Chairman of the Audit Committee and as a member of the Compensation, Nominating and Governance, and Executive Committees.  Good has been a consultant for the accounting firm of Cohn Reznick LLP since February 2010.  Good founded the accounting firm of Good, Swartz, Brown & Berns (predecessor of Cohn Reznick LLP) in 1976 and served as an active partner until February 2010.  He has been active in consulting and advisory services for businesses in various sectors, including the manufacturing, garment, medical services and real estate development industries.  Good founded California United Bancorp and served as its Chairman through 1993.  From 1997 until the company was sold in 2006, he served as a Director of Arden Realty Group, Inc., a publicly held Real Estate Investment Trust listed on the New York Stock Exchange.  Good currently serves as a Director of Kayne Anderson MLP Investment Company and Kayne Anderson Energy Total Return Fund, each of which is listed on the New York Stock Exchange.  He also currently serves as a Director of Rexford Industrial

Realty, Inc., a publicly held Real Estate Investment Trust listed on the New York Stock Exchange.  Good also formerly served as a Director of California Pizza Kitchen, Inc. from 2005 to 2008, Youbet.com from 2006 to 2008, and the Walking Company Holdings, Inc. from 1997 to 2009.  He holds a B.S. in Business Administration from the University of California, Los Angeles and attended its Graduate School of Business.  Good is the beneficial owner of 25,125 shares of OSI stock.  He was paid $480,445 in total director compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Good is a citizen of California.

22.    Defendant Meyer Luskin ("Luskin") is a current director and has served on the Board since February 1990.  He serves as the Chairman of the Compensation Committee and as a member of the Audit, Nominating and Governance, and Executive Committees.  Since 1958, Luskin has served as a Director of Scope Industries, whose principal business is recycling and processing of food waste products into animal feed, and has also served as its President, CEO, and Chairman since 1961.  He currently serves on the Board of Advisors of the Santa Monica – UCLA Medical Center and Orthopaedic Hospital and was formerly the Chairman.  Luskin is also a Director of the Orthopaedic Institute for Children (previously known as the Los Angeles Orthopaedic Hospital) and was formerly the Chairman.  He is also a Director on the Advisory Board of the UCLA Luskin School of Public Affairs, a Director of the UCLA Foundation, a Director of the Alliance for College-Ready Public Schools, and a Director of the Jazz Bakery.  Luskin also served as a Director of Myricom, Inc., a computer and network infrastructure company.  He holds a Bachelor of Arts degree from the University of California, Los Angeles and a Masters in Business Administration from Stanford University.  Luskin is the beneficial owner of 54,485 shares of OSI stock.  He was paid $480,445 in total director

compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Luskin is a citizen of California.

23.    Defendant Ajay Mehra ("Mehra") is a current director and has served on the Board since March 1996.  He is Executive Vice President of OSI and President of the Security Solutions business within the Rapiscan Systems division.  Mehra joined the Company as Controller in 1989 and served as Vice President and Chief Financial Officer ("CFO") from November 1992 until November 2002, when he was named Executive Vice President.  Prior to joining the Company, Mehra held various financial positions with Thermador/Waste King, a household appliance company, Presto Food Products, Inc., and United Detector Technology.  He holds a Bachelor of Arts degree from the School of Business of the University of Massachusetts, Amherst and a Master of Business Administration degree from Pepperdine University.  Mehra is the beneficial owner of 326,399 shares of OSI stock.   He was paid $3,446,424 in total executive compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Mehra is a citizen of California.

24.    Defendant Alan Edrick is Executive Vice President and CFO of the Company.  He joined the Company in this role in September 2006.  Between 2004 and 2006, Edrick served as Executive Vice President and CFO of BioSource International, Inc., a biotechnology company, until its sale to Invitrogen Corporation.  Between 1998 and 2004, he served as Senior Vice President and CFO of North American Scientific, Inc., a medical device and specialty pharmaceutical company.  Between 1989 and 1998, Edrick was employed by Price Waterhouse LLP in various positions including Senior Manager, Capital Markets.  Edrick received his Bachelor of Arts degree from the University of California, Los Angeles and a Master of Business  Administration  degree  from  the  Anderson  School  at  the

University of California, Los Angeles.  Edrick is the beneficial owner of 135,699 shares of OSI stock.  He was paid $3,240,851 in total executive compensation for the fiscal year ending June 30, 2013.  Upon information and belief, Edrick is a citizen of California.

25.   Chopra, Mehra, Ballhaus, Feinberg, Good, and Luskin are collectively referred to as the "Director Defendants," and, together with Edrick, as the "Individual Defendants" or "Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

26.   By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not to further their own personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.   As directors and/or officers of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

28.    As directors and/or officers of OSI, the Individual Defendants had ultimate responsibility for ensuring that OSI complied with the law and federal regulations and that OSI's business was conducted in an ethical manner.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of OSI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with OSI, each of the Individual Defendants had access to non-public information about the financial condition, operations, sales and marketing practices, and improper business practices of OSI.

30.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

b.    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and that it complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

       c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls, so that the Company's financial reporting would be true and accurate at all times;

       d.      remain informed as to how OSI conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take sufficient steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state laws;

       e.      refrain from wasting OSI's assets;

       f.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       g.      properly disclose all material information regarding the Company, required by applicable state and federal laws and/or their relevant duties, to OSI's shareholders.

31.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of OSI, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also directors and/or officers of the Company during the Relevant Period has been ratified by the remaining Individual Defendants, who collectively comprised all six members of OSI's Board during the Relevant Period.

32.    The Individual Defendants' actions have irreparably damaged OSI's corporate image and goodwill.  Moreover, the Individual Defendants have jeopardized the relationship with OSI's two most important customers to such an extent that the Company's ability to continue to contract with the DHS and TSA in the future is now imperiled.

33.    The Individual Defendants breached their fiduciary duties by: (1) causing OSI to manipulate an operational test of its body scanners by "cherry-picking" sensors used for the test that were not representative of the scanners that were actually deployed at airports; (2) causing OSI to unlawfully use and misleadingly label an unapproved foreign-made part in its baggage-screening devices; (3) repeatedly jeopardizing OSI's relationships with its two most important customers; (4) failing to maintain an adequate system of internal controls and oversight; and (5) causing OSI to make false and misleading positive statements about the Company and its outlook, and, therefore, subjecting the Company to possible liability and the cost of defending itself from a securities fraud class action lawsuit.

**COMMITTEES OF OSI'S BOARD AND ACCOMPANYING DUTIES**

34.    The composition of the Committees of OSI's Board did not change during the Relevant Period.  Thus, at all relevant times, the composition of the Committees of OSI's Board was as follows:

| Director | Audit | Compensation | Executive | Nominating and Governance | Technology |
|---|---|---|---|---|---|
| Steven Good | Chairman | Member | Member | Member | - |
| Meyer Luskin | Member | Chairman | Member | Member | - |
| David Feinberg | - | - | - | Chairman | Member |
| William Ballhaus | Member | Member | - | - | Member |

14

## I.        Duties of the Audit Committee Members

35.    During the Relevant Period, OSI's Audit Committee, comprised of Defendants Good, Luskin, and Ballhaus, had direct oversight of and responsibility for OSI's system of internal controls and the annual financial information provided to shareholders and the SEC.

36.    During the Relevant Period, the Audit Committee's Charter was "vague" and did not focus on OSI's compliance with federal regulations applicable to its business with the federal government, even though such business was a core part of OSI's business.  OSI's Board further failed to grant authority to a high-level executive at OSI to ensure compliance with applicable laws.

37.    The Individual Defendants allowed OSI to languish without executive leadership in the compliance area until 2013 when, in the aftermath of OSI's near debarment and for the first time, the Individual Defendants created the position of Director of Corporate Compliance.  At that time, the Individual Defendants took steps to put in place an Ethics and Compliance Program Charter that clearly delegated authority and responsibilities to the Director of Corporate Compliance.  The Ethics and Compliance Program Charter was to make clear that the Director of Corporate Compliance had an obligation to report to the Audit Committee so that OSI's Board would finally have a formal structure in place to monitor compliance risks to the Company.  Prior to these reforms, the Audit Committee lacked any ability to receive reports regarding the Company's compliance with federal laws and regulations.

38.    However, even when the Director of Corporate Compliance gained the ability to report to the Audit Committee, he continued to fail to take his job seriously, and failed to meet with the Audit Committee on a regular basis.

## II.   Duties of the Compensation Committee Members

39.   According to the charter of OSI's Compensation Committee, committee members are required to, among other things, evaluate the performance of the CEO and other executive officers of the Company and, based on such evaluation, review and approve the annual salary, bonus, stock options, and other benefits, direct and indirect, of the CEO and other executive officers; and review and recommend to the full Board of Directors compensation of directors, as well as directors' and officers' indemnification and insurance matters.

## III.   Duties of the Nominating and Governance Committee Members

40.   According to the charter of OSI's Nominating and Governance Committee, committee members may, among other things, develop and/or recommend to the Board a set of corporate governance principles and keep abreast of developments with regard to corporate governance to enable the Committee to make recommendations to the Board in light of such developments as may be appropriate; and consider, develop, and/or recommend to the Board policies, procedures, guidelines, and studies with respect to independence of directors, director qualifications, and corporate governance principles.[1]

### CONTROL, ACCESS, AND AUTHORITY

41.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by OSI.

---

[1]      The charter for the Technology Committee is not publicly available.

16

42.    Because of their advisory, executive, managerial, and directorial positions with OSI, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of OSI.

43.    Each of the Individual Defendants was the agent of each of the other Individual Defendants and of OSI, and was at all times acting within the course and scope of such agency.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:

a.    the Company was improperly recording revenue, including the creation of non-existent revenue and booking revenue in a period earlier than when it was earned;

b.    as a result, OSI's revenue and financial results were overstated;

c.    OSI's financial statements were not prepared in accordance with the Generally Accepted Accounting Principles ("GAAP");

d.    the Company lacked adequate internal and financial controls; and

17

e.    as a result of the foregoing, OSI's financial statements were materially false or misleading at all relevant times.    In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

46.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.    During this time, they caused the Company to issue false or misleading financial results based upon non-existent revenue or based on revenue that was improperly recorded in a period earlier than when it was earned.

47.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment; and (b) disguise and misrepresent OSI's future business prospects.

48.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

18

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

## I.   OSI and the Rapiscan Product

50.   OSI, together with its subsidiaries, is a vertically integrated designer and manufacturer of specialized electronic systems and components for "critical" applications.  OSI sells products and provides related services in diversified markets, including homeland security, healthcare, defense, and aerospace.  OSI has three operating divisions: (1) Security; (2) Healthcare; and (3) Optoelectronics and Manufacturing.

51.   *The Security division* provides security and inspection systems, turnkey security screening solutions, and related services.  It designs, manufactures, markets, and services security and inspection systems under the "Rapiscan Systems" trade name.  Rapiscan Systems products fall into the following categories: baggage and parcel inspection; cargo and vehicle inspection; checked baggage screening; people screening; and radiation detection.  Rapiscan's products employ advanced X-ray and neutron-based technology and computer imaging software to detect dangerous or otherwise contraband material, such as explosives, weapons, and narcotics. Rapiscan's products are deployed at airports, prisons, border crossings, shipping facilities, government facilities, amusement parks, banks, courthouses, sports arenas, and other venues with security concerns.

52.   *The Healthcare division* provides patient monitoring, diagnostic cardiology, and anesthesia systems.

53.   *The Optoelectronics and Manufacturing division* provides specialized electronic components and electronic manufacturing services for the Security and Healthcare divisions, as well as to external original

equipment manufacturer clients for applications in the defense, aerospace, medical, and industrial markets, among others.

54.   OSI is highly dependent on Rapiscan.  According to OSI's 2013 Annual Report on Form 10-K, which was signed by all Individual Defendants, the Security division, and particularly the Rapiscan machines are of critical importance to OSI. Through its Security division, the Company designs, manufactures, markets and services security and inspection systems under the "Rapiscan Systems" trade name.  Rapiscan Systems products fall into four categories—baggage and parcel inspection; cargo and vehicle inspection; hold (checked) baggage screening; and people screening.  They are used to search for weapons, explosives, drugs and other contraband as well as for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials.

55.   The Security division is by far the largest division at OSI.  In fiscal year 2012, the Security division revenues amounted to $391.8 million, or approximately 49% of the Company's revenues.  Rapiscan also accounted for revenues of $372.2 million, or approximately 46% of the Company's total revenues, in fiscal year 2013.

56.   Within Rapiscan, the largest single customer is the U.S. government, with individual government customers including the U.S. Customs and Border Protection, U.S. Department of Defense, and Federal Bureau of Prisons.  Two of the most important customers of OSI's Rapiscan Systems are the DHS and the TSA, one of the constituent agencies of the DHS.  According to Bloomberg, from fiscal year 2009 through December 2013, OSI received $463 million in U.S. government contracts, including $267 million in work for the DHS.

57.   The Rapiscan division is so important that OSI's Form 10-K contains a specific risk disclosure regarding its importance to the Company:

> Sales of security and inspection systems and turnkey security screening solutions often depend upon the decision of governmental agencies to upgrade or expand existing airports, border crossing inspection sites, seaport inspection sites, military facilities and other security installations.  In the case of turnkey security screening solutions, the commencement of screening operations may be dependent on the approval, by a government agency, of the protocols and procedures that our personnel are to follow during the performance of their activities.

OSI recognizes in its SEC filings that the loss of these government customers could have a negative effect on its reputation and could have a material adverse effect on its business, finances, and results of operations.

58.   Further, in its Form 10-K filed with the SEC on August 16, 2013, OSI recognized some of the risks particular to government contracts, stating in part that such contracts:

> typically contain provisions and are subject to laws and regulations that give the government agencies rights and remedies not typically found in commercial contracts, including providing the government agency with the ability to unilaterally:
>
> - terminate our existing contracts;
>
> - reduce the value of our existing contracts;
>
> - modify some of the terms and conditions in our existing contracts;
>
> - suspend or permanently prohibit us from doing business with the government or with any specific government agency;
>
> - control and potentially prohibit the export of our products;

21

- cancel or delay existing multiyear contracts and related orders if the necessary funds for contract performance for any subsequent year are not appropriated;

- decline to exercise an option to extend an existing multiyear contract; and

- claim rights in technologies and systems invented, developed or produced by us.

Most U.S. government agencies and some other agencies with which we contract can terminate their contracts with us for convenience, and in that event we generally may recover only our incurred or committed costs, settlement expenses and profit on the work completed prior to termination. If an agency terminates a contract with us for default, we may be denied any recovery and may be liable for excess costs incurred by the agency in procuring undelivered items from an alternative source. We may receive notices under such contracts that, if not addressed to the agency's satisfaction, could give the agency the right to terminate those contracts for default or to cease procuring our services under those contracts. The U.S. government may also initiate administrative proceedings that, if resulting in an adverse finding against us or our subsidiaries as to our present responsibility to be a U.S. government contractor or subcontractor, could result in our company or our subsidiaries being suspended for a period of time from eligibility for awards of new government contracts or task orders or in a loss of export privileges and, if satisfying the requisite level of seriousness, in or debarment from contracting with the U.S. government for a specified term as well as being subject to other remedies available to the U.S. government.

59.     The ability of a governmental agency to terminate a contract is codified in the Code of Federal Regulations, Title 48 – Federal Acquisition Regulations System ("FAR"). A contract may be terminated, *inter alia*, "for convenience" or "for default." Specifically:

a.     A termination "for convenience" entails "the exercise of the Government's right to completely or partially terminate

22

performance of work under a contract when it is in the Government's interest." 48 C.F.R. Part 2.101.

b.    A termination "for default" entails "the exercise of the Government's right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations." *Id.*; *see also* 48 C.F.R. Part 49 – Termination of Contracts.

60.    Prior to termination, a government agency may send a "show cause" letter to a government contractor.  These letters are sent when the government believes a contractor is not complying with the terms of its contract.  They represent a last chance for the company to demonstrate that it has not violated the contract.  Show cause letters are rare because most contractors endeavor to meet the government's requirements.

61.    Termination of a contract by the government is an even more extraordinary measure.  For example, for the DHS in fiscal year 2007, out of 78,955 total contracts, only 767 were terminated – less than 1%.  Terminations for default represent an even tinier fraction of government contracts.  In fiscal year 2012, terminations for default represented only 7.5% of all terminated contracts across all U.S. government agencies.  Companies that have a contract terminated may have a more difficult time winning new business from that agency or other government agencies.

62.    Because of the government's unilateral ability to terminate contracts for convenience or default, meticulous compliance with the terms of government contracts was crucial to OSI.   Failure to remain in compliance could result in the abrupt cancellation of contracts on onerous terms and the failure of its government customers to renew or sign new contracts with OSI.

63.   The federal suspension and debarment process is used to promote economy and efficiency in federal procurement by ensuring that the U.S. government conducts business only with responsible contractors. FAR Subpart 9.4 provides legal authority for federal agencies to suspend or debar an entity or individual (known as "Respondents") on the basis of adequate evidence, or a preponderance of evidence respectively, of the commission of fraud or other conduct indicating a lack of business honesty.

64.   Suspension is an action taken by the agency's Suspension and Debarment Official ("SDO") under FAR 9.407 or under Subpart G of the Nonprocurement Common Rule.   A suspended person or entity is disqualified temporarily from government contracting and government-approved subcontracting of covered transactions, pending completion of an agency investigation and any judicial or administrative proceedings that may ensue.   Suspension is based on adequate evidence (*i.e.*, a conviction is not required) of certain activities, such as commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public contract, as well as activities like commission of embezzlement, theft, tax evasion, violating federal criminal tax laws, or commission of any other offense indicating a lack of business honesty that seriously and directly affects the present responsibility of a government contractor or subcontractor.

65.   Debarment is an action taken by the SDO under FAR 9.406 or under Subpart H of the Nonprocurement Common Rule.   A debarred person or entity is excluded from government contracting and government-approved subcontracting or covered transactions for a reasonable specified period.   Debarment may be based on a Respondent's conviction of a crime or a civil judgment for the same violations noted above, or for other causes like a determination by the Secretary of Homeland Security or the Attorney

24

General of the United States that the Respondent is not in compliance with the Immigration and Nationality Act employment provisions.

66.     Debarment would be a crippling blow to the Company, precluding it from contracting with the DHS or TSA and thus depriving it of a significant source of revenue.

67.     Despite these grave consequences, during the Relevant Period, the Individual Defendants allowed two major misconducts at Rapiscan to flourish on their watch, causing the Company to violate federal regulations, jeopardizing the Company's relationship with its government customers, and putting a significant portion of its revenue at risk.

68.     Given the fact that the Security division represents approximately half of OSI's revenues, it is no surprise that Rapiscan-related issues would be of vital interest to the Company and its shareholders.

## II.     The Individual Defendants Cause OSI to Fail to Upgrade Critical Software and to Manipulate Testing

69.     In the spring of 2009, the DHS announced that AIT systems, also known as whole-body imaging, would be used as the primary screening technique in U.S. airports.  AIT technologies screen passengers for metallic and non-metallic threats including weapons, explosives, and other dangerous objects concealed under clothing.

70.     Rapiscan's AIT system is the Secure 1000 Single Pose ("Secure 1000SP").  The Secure 1000SP operates in the following manner: a person enters the scanning chamber, poses, and low-intensity X-rays quickly scan the person.   The reflected X-rays are collected by detectors and a "backscatter signal" from each point on the person is recorded.  Imaging software then processes the data and creates a two-dimensional image for the operator to view.  Metallic objects or other items appear darker than the scanned person.

71.    In September 2009, OSI announced that the TSA awarded the Company a $173 million Indefinite Delivery, Indefinite Quantity ("ID/IQ") contract for its AIT systems, including the Secure 1000SP.  At roughly the same time, the TSA awarded OSI's principal competitor in the space, L-3, a similar contract.

72.    Beginning in late 2009, and increasingly in 2010, however, privacy concerns emerged regarding the Secure 1000SP and other AIT body scanners.  Travelers were offended by the revealing images produced, the lack of signage regarding the machines, and the absence of a meaningful alternative to the scans.  Privacy advocates objected to the machines' storage and transfer capabilities and the inadequacy of "privacy filters" installed on the machines.

73.    On July 2, 2010, the Electronic Privacy Information Center sued the TSA, seeking a court order to halt the use of the scanners, saying that the devices were a danger to health, ineffective, and a breach of the Constitutional right to privacy.  The U.S. Court of Appeals for the District of Columbia Circuit ultimately ruled that the TSA should have allowed for public comments to be submitted and considered before requiring passengers to undergo the revealing scans.  The court ordered the TSA to initiate a public rulemaking process.

74.    In response, the TSA put out a contract in August 2010 asking OSI and its principal competitor, L-3, to develop software to make the images less revealing.  The software, known as Automated Target Recognition ("ATR"), is designed to eliminate the "naked body" images produced by the previous generation of body scanners.  Rather than a passenger-specific image, ATR software displays a generic figure, and any anomalies are indicated by colored zones.  The identification of an anomaly then allows the technician operating the scanner to administer additional

targeted resolution procedures, such as a pat-down or a scan with a metal-detecting wand.

75.    Other companies began to upgrade their systems to include ATR technology.   L-3, the only OSI competitor awarded an AIT body-screening contract, had already completed its development and installation of ATR software on all its AIT scanners between July and September of 2011.

76.    On January 24, 2012, OSI hosted a conference call for investors and analysts to discuss quarterly results.   On the call, Defendant Mehra made the following false statement in response to an analyst's question:

> **Analyst**:  [W]hat is the TSA telling you now about the potential for additional body scanner orders?  There has been a lot of noise about the fears around backscatter.
>
> **Defendant Mehra**:  Basically, we are working with TSA.  ***It's business as usual.***  We are actually going through some operational testing of our ATR, which is the Automatic Threat Recognition system — basically takes away the image.  ***So, we're going through that process, working with them, and we expect that they will be looking at potential orders within the next few months.***

[Emphasis added.]

77.    On February 14, 2012, Congress passed the FAA Modernization and Reform Act of 2012 (P.L. 112-95), which required the updated, generic imaging ATR software to be installed on all AIT equipment by June 1, 2012.

78.    OSI almost immediately encountered problems.    Its AIT scanners employed 16 photomultiplier tubes ("PMTs"), which created images for TSA agents to view onscreen.  As the PMTs age, they generate increased negative voltage.  When OSI installed the generic image software upgrade on the AIT systems with older PMTs, the negative voltage caused the machines to no longer generate any images whatsoever.

79.    This was problematic for two reasons: (1) older machines with aging PMTs already installed in airports would be rendered useless when the new software was installed; and (2) since all of the machines would eventually age, even newer machines would eventually be rendered useless.

80.    In discussing OSI's compliance with the U.S. government's mandate, OSI repeatedly made representations to investors and in response to analysts' questions, stating that it was "business as usual," that the new software was "undergoing its final testing" and "we think that could lead to more sales in the future" or "within the next few months."  In reality, however, Rapiscan encountered significant difficulties in developing the upgraded ATR software and OSI was not close to developing software that would satisfy the Congressional mandate.

81.    Recognizing that it was not "business as usual," that the software was not in "final testing," and that the ATR software development program was suffering from significant delays, Rapiscan requested an extension of the TSA's June 1, 2012 deadline.  As he later testified before the U.S. House of Representatives Committee on Appropriations, TSA Administrator John Pistole granted a waiver of the deadline to May 31, 2013, based on the appearance "that ATR certification was near."

82.    Even with the extension of the deadline, Rapiscan was unable to develop ATR software that would meet the required specifications.  With that continuing failure as the backdrop, Rapiscan resorted to knowingly manipulating the TSA's testing process to ensure that the ATR software would pass.  To validate the need for an extension, the Company sent three machines to the TSA for testing to prove that a workable solution was close at hand.  However, the three machines were hand-picked by OSI, such that they contained the newest photomultiplier tubes.

83.   In other words, in order to create the impression that "ATR certification was near," the Individual Defendants caused the Company to "cherry-pick" the few machines that were not encountering problems to send to the TSA for testing.   For example, according to the amended complaint in the securities fraud class action against some of the same Defendants, Confidential Witness 2 stated that "there was some manipulation of the data on the part of the engineers."  Likewise, according to the amended complaint in the securities fraud class action, Confidential Witness 4 stated that former quality assurance director Robert Mosley would have been aware of any manipulation and that this information would have been known "all the way up to the president."  In addition, the securities fraud class action complaint alleged that Confidential Witness 1 stated that these problems were also documented as Issue #8117 in the Rapiscan's defect tracking database, which was allegedly accessible to **all** OSI's management.

84.   As one analyst observed, "the ATR software tested by TSA this summer required OSI's 'photo detectors' to have a minimal amount of what is called 'drift' in order to pass through the testing properly.   When manufactured, not all these sensors have the same amount of 'drift;' however, this was not a problem in the AIT machines whose images would be viewed by a human.   The problem was, the ATR software required sensors with minimal 'drift,' so to solve this OSI simply manually selected the best sensors that came off the line for the three AIT units sent for testing."   Not surprisingly, the three "pristine" Secure 1000SPs passed the TSA's certification procedure.

85.   Rather than inform the TSA and investors of its known inability to meet the deadline, the Individual Defendants continued to knowingly or with reckless disregard represent to the market throughout 2012 that OSI

was on track to comply with the TSA's directive in a timely manner, stating, *inter alia*:  (1) "We are actually going through some operational testing of our ATR . . . and we expect that [TSA] will be looking at potential orders within the next few months"; (2) "ATR [is] . . . undergoing its final testing as we speak"; and (3) "[W]e're currently in testing, so we've completed on our side and the customer's currently in testing. We're hopeful that that could happen – that could be completed any time this summer."

86.    Months before November 2012, without disclosure to investors, OSI notified the TSA that Rapiscan was so far behind schedule that it would be unable to meet the extended deadline of May 31, 2013.  OSI explained to the TSA that in order for Rapiscan's ATR software to be functional, either the 250 Secure 1000SPs in the field would have to be upgraded, or Rapiscan would have to continue its efforts to develop ATR software that would work with lesser technology.   Notably, while OSI admitted its limitations to the TSA, the Company did not disclose to investors Rapiscan's inability to meet the TSA's deadline until much later.

87.    Indeed, on an October 23, 2012 conference call with investors and analysts, Defendant Edrick was reassuring the public of OSI's commitment to, and belief in, its Secure 1000SP product:

> **Analyst**:   And then there were three different vendors that were awarded AIT to development contractors for next-generation body scanners.  Rapiscan so far hasn't received one of those development contracts.  Is that a market opportunity you're still pursuing?

> **Defendant Chopra**:    Tim, as you know, many, many conference calls before — I remember Brian especially asking and I think you're asking — our whole focus is a broad product portfolio.  ***Definitely body scanners are an important portion of our portfolio***, but it's insignificant revenue.  As a matter of fact, I think Alan made a comment a couple of conference calls ago that our revenue intake in 2012 was zero.

30

Once we say that, **it doesn't mean that we don't have a great product**.  There is a throughput issue that TSA feels at larger airports.  The L3's unit is faster than our unit.  So they decided that for that sake of the throughput, they would like to get more units of the faster speed, and are putting our units in the smaller airports.  When you leave aviation away, the throughput does not matter.  Performance matters maybe more.

And we are very well entrenched into the non-aviation sector, especially the DOD and some of the high-security areas like nuclear facilities.  We continue to pursue this area.  And as you know, though we did not participate — we did not get a contract this time around, **we do have an active ID/IQ with the TSA on our product, and we can always go back into it**.  Unfortunately, it's true that we did not win it this time and we just continue to move forward.

[Emphasis added.]

88.   Also during the October 23, 2012 conference call, Defendant Chopra highlighted the Rapiscan business in his opening comments:

**Reviewing the highlights for the quarter, starting with our Security division, Rapiscan revenues increased 14% to $83 million**.  During the quarter, we had many key accomplishments that should serve as seeds for future growth. Highlighting a few of these activities, Rapiscan's 620 Dual View Baggage and Parcel Inspection System received the European Standard 2 approval for threat detection of liquid explosives.

The 620 DV can differentiate between threatening and benign liquids.  **I should note here that the 620DV has also been approved for use by the UK's Department of Transport and the TSA in the US for both aviation checkpoint screening and air cargo screening**.  As mentioned earlier, we have the broadest product portfolio for air cargo screening compared to any of our competitors. 620DV's are in other applications also, such as military checkpoints, customs, and border security. 620DV is a part of a broad portfolio of checkpoint screening solutions that we

31

provide our customers to secure aviation and other critical infrastructure security.

[Emphasis added.]

89.    In the months preceding this call, OSI's stock traded steadily between approximately $70 and $80 per share.

90.    Soon thereafter, on November 9, 2012, the TSA delivered to OSI a show cause letter related to the ATR software, which alleged that Rapiscan had not disclosed issues related to the development process in a timely or complete manner.  Part of the letter questioned whether, prior to testing, Rapiscan had installed sensors on three Secure 1000SP units that did not conform to the sensors approved in the system's configuration plan, and, if so, whether Rapiscan had informed the TSA of that change in a timely manner.

91.    On November 13, 2012, Congressman Mike Rogers, Chairman of the House Transportation Security Subcommittee, sent a letter to TSA Administrator John Pistole saying that a supplier of passenger-scanning machines in United States airports, later confirmed to be Rapiscan, "may have attempted to defraud the government by knowingly manipulating an operational test" by falsifying tests of software intended to stop the machines from recording graphic images of travelers.

92.    On November 14, 2012, OSI finally publicly admitted that its earlier statements to both the TSA and investors were knowingly false and misleading.  Specifically, Peter Kant, an Executive Vice President, admitted that Rapiscan became aware of an issue related to software under development ***months previously*** and had promptly notified the TSA.

93.    Nonetheless, on November 15, 2012, the Individual Defendants caused OSI to issue a press release denying that Rapiscan falsified test data.

32

The press release was filed with the SEC on Form 8-K (signed by Defendant Edrick):

> OSI Systems, Inc. (NASDAQ: OSIS), a vertically-integrated provider of specialized electronics and services, announced today that on November 9, 2012 Rapiscan Systems, its Security division, was delivered a show cause letter from the U.S. Transportation Security Administration (TSA). The letter, which pertains to a privacy system Rapiscan was developing under contract for the TSA, alleges that Rapiscan did not disclose issues related to the development process in a timely or complete manner. Contrary to some press reports, Rapiscan did not falsify test data; in fact, TSA testimony to Congress today confirms that this was at all times a government controlled test and that Rapiscan could not have manipulated any test data.
>
> Furthermore, the evidence shows that Rapiscan delivered for testing the exact configuration previously disclosed to TSA and which TSA had approved. "At no time did Rapiscan Systems falsify test data or engage in any fraudulent conduct," OSI Systems President and CEO, Deepak Chopra, commented. "We take the matter very seriously and are fully cooperating with the TSA during this process."

94. The market's reaction to this news was swift. OSI common stock closed at $76.29 on November 14, 2012. The following day, OSI common stock plummeted approximately 30% to close at $54.89 on a volume of more than 4.4 million shares traded. This was approximately 40 times the trailing three-month daily average volume and represented a market cap loss of more than $100 million.

95. On November 15, 2012, *Bloomberg News* ran an article regarding OSI's troubles, disclosing the following:

> OSI Systems Inc.'s Rapiscan unit, one of two suppliers of passenger-scanning machines in U.S. airports, may have falsified tests of software intended to stop the machines from recording graphic images of travelers, a U.S. lawmaker said. . . .

33

***The company "may have attempted to defraud the government by knowingly manipulating an operational test,"*** Representative Mike Rogers, chairman of the House Transportation Security Subcommittee, said in a letter to Transportation Security Administration chief John Pistole Nov. 13. Rogers said his committee received a tip about the faked tests.

*       *       *

While Rogers' letter doesn't identify the company, his spokesman, Shea Snider, confirmed in an e-mail that he was referring to Rapiscan.

OSI fell $22.97, or 30 percent, to $53.32 at 3:37 p.m., the biggest intraday decline since December 2000. More than 4.4 million shares had changed hands, about 40 times the three-month daily average.

*       *       *

If wrongdoing is proven on the government contracts, Rapiscan could face fines, prison terms and a ban on government contracting, said Dan Gordon, former head of federal procurement for President Barack Obama's administration.

***"Fake test results are incredibly serious," said Gordon, now a dean at George Washington University Law School in Washington. "Every false statement is a criminal act, sending someone in that company to jail."***

[Emphasis added.]

96.   Analysts quickly took note of the seriousness of the situation. For example, on November 15, 2012, William Lee and Yair Reiner, analysts at Oppenheimer, noted that "the TSA apparently concluded that Rapiscan manipulated test results for a software algorithm it was developing to enhance privacy features on its full body scanners. Attempts to defraud the US govt. can in theory bring fines, imprisonment, or a ban on further government contracting." Further, they noted that "[t]he risk is that the

probe metastasizes into something bigger, threatening Rapiscan's reputation."

97.   On November 16, 2012, Mike Greene, a securities analyst at Benchmark, wrote a note on OSI's "cherry picking" of sensors it used for the test, stating:

> While we strongly agree that the company did not and could not have manipulated any test data, due to the fact that the TSA was in control of the product for the entirety of testing, **it appears the company may have made some "grey area" changes to the product that it delivered for testing**. As it turns out, the ATR software tested by TSA this summer required OSI's "photo detectors" to have a minimal amount of what is called "drift" in order to pass through the testing properly. When manufactured, not all these sensors have the same amount of "drift;" however, this was not a problem in the AIT machines whose images would be viewed by a human. The problem was, the ATR software required sensors with minimal "drift," so to solve this OSI simply manually selected the best sensors that came off the line for the three AIT units sent for testing. These scanners passed the testing, but when TSA wanted to fully deploy the new ATR software, it was told that **all** the 250 deployed OSI scanners would need to be upgraded to "minimal drift" photo detectors (or retested with software that could work with lower-quality detectors). So, while the headline that OSI "faked" a body scanner test is absolutely false, **it does appear that OSI "cherry picked" sensors that made the test not representative of the scanners currently deployed at airports, without informing the TSA.** [. . .] We understand why TSA would be upset with this, particularly if not informed of the difference between the test units and the overall deployed inventory in a timely fashion, and hypothesize the dispute largely comes from the sensors having the same "SKU" regardless of drift, resulting in a bit of a gray area change, in our view.

[Emphasis added.]

98.   Also on November 16, 2012, Tim Quillin, an analyst at Stephens, commented: "We believe OSIS submitted 3 units to the TSA for

35

operational testing and evaluation in late spring or early summer. At some point, the Company realized that the perfect uniformity of the test units' x-ray sensors might not be representative of fielded units, which typically have some drift from perfection."

99. On January 17, 2013, OSI announced that the TSA had terminated its software contract with the Company and, furthermore, that OSI would have to bear the costs of removing all 174 remaining Rapiscan full-body scanners from airports, because the TSA concluded that the Company could not meet the congressional deadline to produce more generic passenger images. A spokesperson for TSA confirmed that the government had terminated the contract "for convenience," an unusual step. OSI concurrently disclosed that it planned to de-book the $5 million backlog related to ATR development and expected to incur a $2.7 million one-time impairment related to capitalized software development costs. As a result of this news, the price of OSI shares dropped $14.03 per share to $57.33, a decline of over 19%.

100. Soon thereafter, the TSA signed a $245 million contract with American Science and Engineering, a company that uses the same backscatter technology as OSI, but had successfully developed privacy software.

101. During the next regularly scheduled call with analysts on January 24, 2013, attended by Defendants Chopra and Edrick and others, Defendant Chopra gave short shrift to the issues with Rapiscan:

> First, as you know, Rapiscan Systems received a show cause letter from the TSA in November. We believe we have clarified all of the questions in the show cause letter to TSA. The final resolution of the show cause letter is subject to final disposition by the Department of Homeland Security and the Company is currently working diligently to complete that process.

36

102.   On the January 24, 2013 conference call, Defendant Chopra made an abrupt about-face, revealing that, despite numerous prior public assertions to the contrary, OSI lacked a commitment to complete the ATR project in the first place, stating that the cancellation of the contract would "allow[] [OSI] to stop the R&D spending on this program for which we saw a limited future beyond the TSA."  In addition, Defendant Chopra made the following false and misleading statement:

> **Analyst**:  On the slowdown in the US Security business, was that related to anything with the TSA?  Or was that related to Border Patrol?  Where was the slowdown?  Was there a specific agency that you saw the slowdown?
>
> **Defendant Chopra**:  Number one, we can categorically say there is no impact on the US business except for the AITD booking.   But we believe that it's just — there's just how everybody is sort of playing too close to the chest in the US until the budget is done.

103.   On April 24, 2013, Defendants hosted a conference call for investors and analysts and concealed that OSI was still at significant risk of being debarred from government contracting:

> **Analyst**:  First question is on the body scanners.  Is that issue 100% behind us?  Have you gotten the final letters?  What's left, if anything?
>
> **Defendant Chopra**:  Well, this is Deepak here, Brian.  As we mentioned in the last conference call, we have resolved our agreement with TSA.  And we are working diligently with TSA to redeploy these units at other government agencies.  And the other thing is that — the other thing that we said on the last conference call with the DHS — there's no change from the last conference call.  We continue to work with them and there is no progress or any conclusion on it.

104.   According to a Form 8-K filed by OSI on May 20, 2013, the Company reported that the DHS had issued a Notice of Proposed

Debarment to OSI, in connection with the November 9, 2012 show cause letter.  As the parent agency of the TSA, the DHS was required to sign off on any final agreement with OSI.   According to OSI's Form 8-K, "The Company understands that the Notice alleges that ***Rapiscan failed to disclose a defect with the Products and replaced hardware in the Products without being granted proper governmental approval***."  [Emphasis added.]  As part of receiving the Notice, Rapiscan was automatically suspended from entering into new contracts with the DHS and its agencies, including the TSA.  As a result of this news, the price of OSI shares dropped $8.05 per share to $53.25, a drop of over 13%.

105.   On June 21, 2013, OSI entered into a 30-month Administrative Agreement ("Administrative Agreement") with the DHS related to the Notice of Proposed Debarment.  That same day, OSI filed with the SEC a Form 8-K (signed by non-party Victor Sze), disclosing:

> On June 21, 2013, OSI Systems, Inc. subsidiaries Rapiscan Systems, Inc. and Rapiscan Government Services, Inc. (collectively, "Rapiscan") entered into a 30-month Administrative Agreement (the "Agreement") with the Department of Homeland Security ("DHS").  The Agreement resolves the May 17, 2013 DHS Notice of Proposed Debarment and automatic suspension of Rapiscan that became effective May 20, 2013.  ***Rapiscan can continue its current and future business with United States federal government agencies.***
>
> ***Pursuant to the terms of the Agreement, Rapiscan has agreed to certain compliance upgrades and organizational improvements, including maintenance of a robust compliance program. Rapiscan has also made certain personnel changes and has created additional positions dedicated to government contracting compliance and administration, corporate compliance, and quality assurance.***  Further, for the duration of the term of the

Agreement, ***Rapiscan has agreed to the continued review of its compliance and ethics program, including the retention by Rapiscan of an independent consultant to perform semi-annual assessments of its compliance policies, procedures, and practices***. Rapiscan has also agreed to additional DHS reporting requirements.

[Emphasis added.]

106.   The Administrative Agreement thus recognized and drew into sharp relief the inadequacy of Rapiscan's and OSI's compliance and ethics program, and the failure of the Board to establish programs and procedures that would have prevented the events that led to the show cause letter and Notice of Proposed Debarment from taking place. These failures would later be corroborated by the Report, which listed a litany of failures and deficiencies in OSI's compliance scheme.

107.   Nonetheless, with Defendant Chopra's assurances that OSI was "working" to remedy the issues the TSA had with Rapiscan, and with the above Form 8-K's statement that Rapiscan would "continue its current and future business with the United States federal government," OSI's stock price gradually recovered from the massive decline. By July 23, 2013, OSI's stock price had risen above $70 per share. However, the problems with Rapiscan, Rapiscan management, and related internal controls were not solved.

## III.   Rapiscan Uses Unapproved Chinese Parts in Its Baggage-Screening Machines

108.   Despite being caught red-handed "cherry picking" sensors in its operational test, and despite nearly being barred from further government contracts, OSI, under the control of Defendants, continued to jeopardize its relationship with its most important customers by allowing its Rapiscan products to violate federal laws and regulations.

109.    On September 16, 2010, OSI announced that the TSA had awarded the Company a five-year, $325 million ID/IQ contract related to checkpoint baggage and parcel scanners known as the Advanced Technology 2 ("AT-2") contract, including Rapiscan's 620DV.  The 620DV uses single and dual-energy X-ray technology to scan briefcases, carry-on baggage, laptops, and small cargo parcels.  The 620DV system's dual view generates a horizontal and vertical view of the object under inspection.  All U.S. government contracts for checkpoint baggage scanners, including those awarded to Rapiscan, contained terms prohibiting changes to parts or configurations without prior government approval.  Further, the contract required all parts to be manufactured and assembled in the United States.

110.    Baggage and parcel inspection was one of OSI's most important product lines.  In April 2012, Defendant Edrick described this area in a conference call for investors and analysts: "This has long been the bread and butter for Rapiscan and it's a very nice product line."  Edrick made similar statements on the importance of this product line throughout the Relevant Period.

111.    Rapiscan delivered hundreds of 620DVs to the U.S. government.  On September 26, 2013, the TSA awarded Rapiscan a $67.1 million contract for 550 620DV units pursuant to its September 2010 AT-2 contract.

112.    Defendant Chopra boasted about this contract in the October 23, 2013 conference call, in which Defendant Chopra stated in response to questions from an analyst:

> **Analyst**:   And then I see Rapiscan has been awarded a checkpoint x-ray systems contract from TSA.  Congratulations on that, by the way.  It's good to see TSA's confidence in you.  Is this currently in your Rapiscan backlog?

**Defendant Chopra**: That's true, Jeff.

113. In truth, Rapiscan was using unapproved X-ray generators manufactured abroad by Shanghai Advanced Non-destructive Equipment Company, Ltd. ("SANDT") to assemble and repair the 620DV scanner. Rapiscan's government contracts expressly prohibited configuration changes without advanced approval from the TSA. Rapiscan did not obtain the TSA's approval and, to conceal the violation, misleadingly labeled the unapproved components with the same part number as the originally approved component. As a result, at least 250 620DVs containing unapproved components manufactured and assembled in China were deployed in airports across the United States.

114. When OSI replaced some of its employees following the revelation of the ATR software issue, the new team discovered that one of the components that Rapiscan was using in the 620DVs required TSA approval under the applicable contract, but that the Company had not obtained it. Despite the fact that the Individual Defendants knew that the Company was using unapproved parts — and therefore was in violation of its contracts — Rapiscan bid on the $67.1 million 620DV contract.

115. According to the amended complaint in the securities fraud class action, "[f]ormer employees confirmed that Rapiscan routinely changed the configuration of one of its products without gaining approval from the TSA in violation of the contracts' terms."

116. OSI's wrongdoing vis-à-vis the government came to an end when, on November 20, 2013, the TSA issued Rapiscan its second show cause letter in twelve months, related to the use of unapproved components in its 620DV scanners. OSI's wrongdoing vis-à-vis investors, however, continued. Form 8-K disclosure and reporting requirements mandate that public companies disclose material developments in their business within

41

four business days.  Here, the Individual Defendants did not disclose the second show cause letter to investors until December 9, 2013, 19 days later, a clear violation of the Form 8-K disclosure rules.

117.   On November 27, 2013, Rapiscan privately responded to the TSA's allegations in the show cause letter.

118.   On December 5, 2013, the TSA sent Rapiscan a notice that the $67.1 million delivery order for 550 620DV units was being terminated for default.

119.   On December 6, 2013, the Individual Defendants caused a Form 8-K to be filed with the SEC (signed by Defendant Edrick), which stated:

> On December 5, 2013, OSI Systems, Inc. announced that its security division subsidiary, Rapiscan Systems, Inc. ("Rapiscan") was notified by the U.S. Transportation Security Administration (TSA) that a delivery order placed with Rapiscan on September 26, 2013 for Advanced Technology X-Ray (AT-2) based systems was being terminated for default.  As a result, the Company has de-booked this order which had a value of approximately $60 million.

120.  Again, Congress reacted harshly to the revelation of OSI's conduct.  On December 6, 2013, several members of the U.S. House of Representatives Committee on Homeland Security, including Michael T. McCaul, Bennie Thompson, Richard Hudson, and Cedric Richmond, wrote a letter to the TSA stating the following:

> We write regarding the recent revelation that Rapiscan Systems ("Rapiscan") violated terms of an existing procurement contract with the Transportation Security Administration (TSA), resulting in the deployment of an estimated 250 Advanced Technology 2 (AT-2) x-ray baggage screening machines with unapproved, untested components across the United States. Further, it is our understanding that these new components — inappropriately labeled with the same part number as the

originally approved component — were entirely manufactured and assembled in the People's Republic of China by Shanghai Advanced Non-destructive Equipment Company, Ltd.

We understand TSA has decided to rescind a $67 million order for an additional 550 new AT-2 systems and move forward with a recommendation to the Department of Homeland Security (DHS) for the debarment of Rapiscan.

Pursuant to Rule X and Rule XI of the U.S. House of Representatives, the Committee requests the following documents:

-       The Engineering Change Proposal (ECP) sent by Rapiscan to TSA on October 24, 2013;

-       The show cause notice sent by TSA to Rapiscan on November 20, 2013, stating that Rapiscan was not in compliance with its contractual obligations;

-       Rapiscan's response to the notice to TSA on November 27, 2013;

-       TSA's notice of award termination sent to Rapiscan on December 4, 2013;

-       Any documents in TSA's possession pertaining to risk assessments of the potential for sabotage or espionage attempts of AT-2 machines; and

-       A parts list and description of those parts outsourced to China.

121.   On December 9, 2013, OSI publicly admitted its wrongdoing. Specifically, OSI admitted that the termination of the TSA contract resulted from Rapiscan's use of an unapproved component in its AT-2 detection systems.   The press release also admitted a complete and systemic breakdown in Rapiscan's quality assurance and contract compliance: "While the component change was vetted by Rapiscan's internal quality assurance, it did not meet the contractual requirement of obtaining TSA's approval in advance."   Quillen, an analyst at Stephens, concluded that use

43

of the unapproved and mislabeled generators was caused by "personnel and compliance shortfalls."

122. Also on December 9, 2013, *Bloomberg News* published an article which discussed these additional problems with Rapiscan and the TSA's abrupt cancellation of a $60 million order. The article by *Bloomberg News* further disclosed the following in relevant part:

> OSI Systems Inc. fell as much as 40 percent, the biggest intraday drop ever, after lawmakers said the company may face a ban on U.S. contracts for using unapproved Chinese-made parts in baggage-screening equipment.
>
> The disclosure came after the Transportation Security Administration canceled a $60 million order last week. The TSA has resumed an effort to bar OSI's Rapiscan Systems unit from future contracts, Representatives Michael McCaul, a Texas Republican, and Bennie Thompson, a Mississippi Democrat, said in a letter dated Dec. 6.
>
> "TSA has strict requirements that all vendors must meet for security effectiveness and efficiency and does not tolerate any violation of contract obligations," David Castelveter, a spokesman, said in an e-mail. "TSA is responsible for the safety and security of the nearly two million travelers screened each day."
>
> Shares fell 26.8 percent to $47.38 at 4 p.m. in New York. Earlier, they were at $39.00, lowest since October 2011. Trading volume was 7.94 million shares, 60 times the three-month average.
>
> OSI's security division, which includes its work for the TSA, generated 46 percent of the company's revenue in the last fiscal year, according to a 10-K filing dated Aug. 16.
>
> The contract raises questions about whether the unapproved component made the Rapiscan machines vulnerable to sabotage or espionage, the lawmakers said. The House Homeland Security Committee, as part of a congressional investigation,

asked the TSA for documents relating to communications between the company and the government.

Ajay Vashishat, OSI Systems' vice president for business development, didn't respond to an e-mail and phone call seeking comment.

A part in the machines made under the canceled contract was manufactured in China, OSI Systems said in a news release today explaining why the TSA ended an order signed less than three months ago.

OSI Systems, based in Hawthorne, California, said the company didn't get TSA's approval for the part, violating its contract.

*   *   *

Rapiscan averted debarment by the Department of Homeland Security last year over accusations it misled the TSA about testing of updated body-scanning machines.  The company, in its 10-K, said Homeland Security could start debarment proceedings again if Rapiscan failed to live up to an agreement signed in June.

OSI had hundreds of the body-scanning machines removed from U.S. airports earlier this year after the TSA concluded the company couldn't meet a congressional deadline to make their revealing images more generic.

The company in June agreed with Homeland Security officials to hire new executives and reassign five senior managers. Rapiscan denied accusations by Representative Mike Rogers, an Alabama Republican, that it fabricated software tests.

Since fiscal 2009, OSI Systems has received $463 million in U.S. government contracts, according to data compiled by Bloomberg.  The company received $267 million in Department of Homeland Security work over the same period.

123.  The market's reaction to this news was significant.  OSI common stock closed at $71.72 on December 5, 2013.  By December 9, 2013, OSI stock was down to $47.38, or more than 40%.

124. Analysts confirmed that Rapiscan used unapproved Chinese parts long before Rapiscan's bid on the $67.1 million contract. According to Quillin, "long before the bid, [Rapiscan] had swapped out a component of its checkpoint x-ray systems without concurrently notifying the TSA of the change. Therefore, the x-ray system, as configured, was not officially certified." Quillin also noted that the issue with the unapproved parts had been going on since "before OSIS' previous kerfuffle with the TSA on the testing of its body scanners." Josephine Millward, an analyst from Benchmark, confirmed that "OSI replaced some of its employees after the body scanner problem and the new team . . . discovered that one of the components in the AT-2 system required advanced TSA approval . . . ." Oppenheimer summed it up as "procedural sloppiness."

125. On December 10, 2013, an analyst from Stephens noted that "[i]t is our understanding that at least 2 relatively senior Rapiscan managers, including its CTO of the past 20 years, were let go after this recent issue came to light."

126. This incident once again brought OSI to the brink of debarment. According to OSI:  "As a result of this termination for default, the Security division has been referred to the U.S. Department of Homeland Security for further review. Although the results of this review cannot be determined at this time, among other consequences, the Security division could be barred from conducting future business with the U.S. federal government for a period of time."

127. On December 12, 2013, a federal securities fraud class action, *Roberti v. OSI Systems, Inc.*, No. 13-cv-09174 (the "Securities Fraud Action") was filed against OSI and its officers in the U.S. District Court for the Central District of California. The operative amended complaint in the Securities Fraud Action, filed on May 20, 2014, names Defendants Chopra

and Mehra, individually.  That complaint was sustained and the motion to dismiss denied on February 27, 2015.

128.  On January 28, 2014, on a conference call with investors and analysts, Defendant Chopra made the following statements:

> As Rapiscan was preparing to execute on the new order [from TSA for 620DV units], our Management team uncovered a contract compliance concern.  They found that a new, more reliable version of the X-ray generator component of the 620DV checkpoint inspection systems **had not gone through the approval process by the TSA**.  And as a result, this generator component had made its way into Rapiscan's replacement parts service inventory and into some of TSA's current installed base at airports without TSA's prior approval.
>
> **This became a problem because Rapiscan was required to seek TSA's approval before introducing the new version into TSA's field population.**  Although the improved generator was more reliable, performed on par to the prior generator and was provided into at no additional cost to the government, **Rapiscan should have sought TSA's approval prior to the change**.
>
> To summarize, **the failure to obtain prior approval for the upgrade to the generator led to a series of events that resulted in the termination of the newly-awarded $60 million order from TSA for default**.  It should be noted that the generator in question, which cost Rapiscan slightly more than the older generator, was sourced from a reliable, well-known vendor that supplies to a number of x-ray security equipment manufacturers worldwide, not just Rapiscan.  In addition, Rapiscan had significant experience with the new generator, as we have been using it successfully in our commercial fleet, which is substantially larger than our government fleet.

[Emphasis added.]

129.  On the same call, Defendant Edrick noted the immediate impact of this second major failure by OSI:

47

**Analyst**:  Okay and then just so I have it straight, are you planning to pro forma out professional fees, primarily legal and consulting, tied to the issue at hand with Homeland Security? In other words, is that in your guidance or is that pro forma'd out?

**Edrick**:  So they are various different aspects of that.  Part of our program consists of, as Deepak was mentioning, bolstering our own internal people, policies, training, et cetera.  ***Then there's also direct costs we're incurring from outside, from a legal perspective.***  Some of those direct costs have been and we do intend to pro forma out; some of the other costs will just be part of our ongoing SG&A component.

[Emphasis added.]

## IV.    False and Misleading Statements

130.    During the Relevant Period, the Individual Defendants made false and misleading statements that OSI and its products were in compliance with OSI's government contracts and all applicable laws and regulations.

131.    The Individual Defendants also consistently touted the strength and healthy prospects of its TSA contracts, while failing to disclose that OSI's standard business practices were violating the terms of those contracts and therefore putting OSI at a substantial risk of having those contracts terminated, as described herein.

132.    For example, on January 24, 2012, OSI hosted a conference call for investors and analysts to discuss quarterly results.   On the call, Defendant Mehra made the following false statement in response to an analyst's question:

**Analyst**:  [W]hat is the TSA telling you now about the potential for additional body scanner orders?  There has been a lot of noise about the fears around backscatter.

**Defendant Mehra**:  Basically, we are working with TSA.  ***It's business as usual.***  We are actually going through some

48

operational testing of our ATR, which is the Automatic Threat Recognition system — basically takes away the image. So, we're going through that process, working with them, and **we expect that they will be looking at potential orders within the next few months**.

[Emphasis added.]

133.   On January 24, 2013, following the disclosure of the show cause letter related to the ATR software, but before the disclosure of the Notice of Debarment, the Individual Defendants hosted a conference call for investors and analysts to discuss OSI's quarterly results.   On the call, Defendant Chopra made the following false and misleading statement:

> **Analyst**:   On the slowdown in the US Security business, was that related to anything with the TSA?   Or was that related to Border Patrol?   Where was the slowdown?   Was there a specific agency that you saw the slowdown?
>
> **Defendant Chopra**:   Number one, **we can categorically say there is no impact on the US business except for the AITD booking**.   But we believe that it's just — there's just how everybody is sort of playing too close to the chest in the US until the budget is done.

[Emphasis added.]

134. On April 24, 2013, the Individual Defendants hosted a conference call for investors and analysts and concealed that OSI was still at significant risk of being debarred from government contracting:

> **Analyst**:   First question is on the body scanners.   Is that issue 100% behind us?   Have you gotten the final letters?   What's left, if anything?
>
> **Defendant Chopra**:   Well, this is Deepak here, Brian.   As we mentioned in the last conference call, we have resolved our agreement with TSA.   And we are working diligently with TSA to redeploy these units at other government agencies.   And the other thing is that — the other thing that we said on the last conference call with the DHS — there's no change from the last

49

conference call.  We continue to work with them and there is no progress or any conclusion on it.

135.  The foregoing statements and other statements referenced in this complaint were false and misleading when made because the Individual Defendants knew but misleadingly failed to disclose the following material, adverse facts:

      a.    as a result of technical difficulties and delays, Rapiscan would be unable to deliver functional ATR software in accordance with Congressional deadlines; and

      b.    Rapiscan knowingly manipulated the TSA's ATR software testing by "cherry-picking" three Secure 1000SP units that Rapiscan knew would perform better than their typical units.

136.  On the October 23, 2013 conference call, Defendant Chopra stated in response to questions from an analyst:

**Analyst**:   And then I see Rapiscan has been awarded a checkpoint x-ray systems contract from TSA.  Congratulations on that, by the way.  It's good to see TSA's confidence in you.  Is this currently in your Rapiscan backlog?

**Defendant Chopra**: ***That's true, Jeff.***

[Emphasis added.]

137.  These statements and other statements referenced herein were false and misleading when made because the Individual Defendants knew but misleadingly failed to disclose the following material, adverse facts:

      a.    OSI, in violation of its contractual requirements with the TSA, used unapproved and untested X-ray generators that were manufactured in China to assemble and repair the 620DV scanner;

      b.    Rapiscan improperly labeled the Chinese components with the same part number as the originally approved component in order to conceal its violation; and

c. the $67.1 million contract for 550 620DV scanners should never have been included in OSI's backlog, because OSI was in violation of the contract providing the TSA with grounds to terminate the contract for default, which the TSA did immediately upon learning of the default.

138. On August 13, 2012, the Individual Defendants caused the Company to file with the SEC on Form 10-K its year-end results for the fiscal year ended June 30, 2012, which was signed by each of the Defendants, and contained required certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") signed by Chopra ("2012 10-K"). Addressing OSI's internal controls over financial reporting, the 2012 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

As of June 30, 2012, the end of the period covered by this report, our management, including our Chief Executive Officer and our Chief Financial Officer, reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) of the Securities Exchange Act of 1934, as amended). Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized and filed or submitted on a timely basis. Based upon that evaluation our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of June 30, 2012.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) or 15d-15(f) of the Securities and Exchange Act of 1934, as amended). Under the supervision and with the participation of management,

51

including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on that evaluation, management concluded that our internal control over financial reporting was effective as of June 30, 2012.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during fiscal 2012 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

139.  On August 16, 2013, the Individual Defendants caused the Company to file with the SEC on Form 10-K its year-end results for the fiscal year ended June 30, 2013, which was signed by each of the Individual Defendants, and contained required SOX certifications signed by Chopra ("2013 10-K").  Addressing OSI's internal controls over financial reporting, the 2013 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

As of June 30, 2013, the end of the period covered by this report, our management, including our Chief Executive Officer and our Chief Financial Officer, reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) of the Securities Exchange Act of 1934, as amended).  Such disclosure controls and procedures are designed to ensure that material information we must disclose in this report is recorded, processed, summarized and filed or submitted on a timely basis.  Based upon that evaluation our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of June 30, 2013.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) or 15d-15(f) of the Securities and Exchange Act of 1934, as amended). Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the 1992 framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management concluded that our internal control over financial reporting was effective as of June 30, 2013.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during fiscal 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

140. These statements were false and misleading when made because the Individual Defendants knew but misleadingly failed to disclose the following material, adverse facts:

a. The Individual Defendants did not have sufficient personnel or resources with sufficient knowledge and expertise to ensure the Company's compliance with governmental contracts; or to

b. ensure the proper administration of governmental contracts by the Company; or to

c. ensure that corporate compliance was maintained by the Company; or to

d. ensure that quality assurance was maintained in the Company's products;

e.    the Individual Defendants did not have in place any meaningful process to evaluate the appropriateness and/or effectiveness of the Company's compliance policies; or to

f.    ensure that strict compliance with government contracts was maintained at all times during the contract period; or to

g.    ensure that the Company and its products that were sold to the U.S. government were compliant with federal law and regulation;

h.    the Individual Defendants did not have in place proper policies and procedures to ensure that information required to be disclosed on Forms 10-Q, 10-K and/or 8-K, was processed, recorded, summarized, and reported within the time period specified in the SEC's rules and forms; and

i.    the Individual Defendants did not have in place proper policies and procedures to ensure that the changes in the Company's internal controls over financial reporting which had materially affected, or were reasonably likely to materially affect, the Company's internal controls over financial reporting were disclosed appropriately and in a timely manner.

## V.    OSI's Board Knew that It Was Not Doing Its Job

141.    The Director Defendants, as directors of OSI, are responsible for ensuring that OSI complies with its legal and contractual duties, so as not to jeopardize its ability to conduct business with its largest customers. Part of that responsibility consists in setting the proper "tone at the top" of the organization, and in creating and enforcing adequate internal controls and policies and procedures for the compliance and ethics functions of the Company.   The Director Defendants utterly failed in this responsibility.

1    They knew, or were reckless in not knowing, of the wrongdoing and,
2    nonetheless, did nothing to prevent or stop it.

3        142.   Defendant Chopra was CEO of OSI, Edrick was Executive Vice
4    President and CFO, and Mehra was President of Rapiscan throughout the
5    Relevant Period.  Due to their senior executive and management positions,
6    Chopra, Edrick, and Mehra knew or should have known about the
7    wrongdoing going on directly under their noses.  Instead of acting to stop it,
8    however, they made a series of false and misleading public statements, and
9    sold millions of dollars' worth of Company stock.

10        143.   Documents obtained from the 220 Demand show that between
11    January 1, 2012 and November 15, 2012, the Board received no information
12    concerning:

13            a.    the TSA's testing of OSI's AIT technology;

14            b.    the difficulties OSI had with meeting the TSA's
15    requirements;

16            c.    Rapiscan's compliance with TSA and DHS security
17    policies and privacy policies;

18            d.    Rapiscan's compliance with federal Acquisition
19    Regulations Systems regarding contract terms with the TSA and
20    DHS;

21            e.    whether OSI's products contained foreign made products;
22    and

23            f.    the way that the Company accounted for contracts with
24    the TSA and DHS.

25    *See* Exhibit A (listing categories of documents demanded pursuant to 8 *Del.*
26    *C.* §220).  Despite the fact that some of the non-executive director
27    Defendants were paid close to half a million dollars per year to shoulder the
28    "ultimate responsibility" for OSI's compliance with the law, OSI's directors

utterly failed to monitor OSI's business to learn about potential compliance issues. In short, the Individual Defendants' oversight of OSI was little more than a high-priced sham.

144. The Board was subsequently briefed on the events leading up to the show cause letter and Congressman Rogers' letter, as well as the discussions between OSI and the TSA and DHS. By then, however, it was too late; the damage to OSI had already been done. Such a pervasive, long-running scheme in one of OSI's key product areas could not have gone undetected by a loyal Board adequately exercising its fiduciary duties.

145. As the Individual Defendants knew, the gaping hole created by their failure to do their job was compounded by the fact that they allowed OSI to operate without a formal compliance structure capable of ensuring that OSI operated in a legal and ethical manner. The Report of the third-party consultant that OSI had to hire in order to avoid debarment described at length the many glaring shortcomings in OSI's compliance regime. The Report assessed OSI's compliance and ethics program against the requirements of Chapter 8 of the U.S. Federal Sentencing Guidelines ("FSG"), the FAR, other relevant regulations, and current best practices.

146. The FSG requires seven general elements for a compliance and ethics program to be considered effective. The FSG states, "The prior diligence of an organization in seeking to prevent and detect criminal conduct has a direct bearing on the appropriate penalties and probation terms for the organization if it is convicted and sentenced for a criminal offense." FSG, §8B2.1, Commentary.

147. The FAR requires that government contractors "conduct themselves with the highest degree of integrity and honesty." 48 C.F.R. Part 3.1002. The FAR also requires companies with qualifying contracts to

56

implement a compliance and ethics program that is in essence identical to the FSG. 48 C.F.R. Part 3.1004(a); 48 C.F.R. Part 52.203-13/14.

148. OSI is also subject to the requirements of Sarbanes-Oxley and NASDAQ for corporate governance.

149. The Report reveals an organization without the proper tools to detect and deal with compliance and ethics issues. The Report covered the following areas: Oversight; Standards and Procedures; Risk Assessment; Training and Education; Monitoring, Auditing & Investigations; and Incentives and Discipline. Major deficiencies were found in each of these areas, including:

### Oversight

∗     Prior to December 2012, **OSI had no position for Director of Corporate Compliance ("DC"), and the position was not filled until May 2013**. The Report found that the placement of the DC at the director level, and under the General Counsel of OSI indicated a lack of authority attached to the position, and a lack of independence from the General Counsel. **At the time of the report, the DC had not been briefing the Audit Committee, had not been included in senior and executive meetings, and did not report directly to the Board or CEO.**

∗     Historically, OSI had no separate and distinct budget for its Compliance and Ethics Program; rather, various elements were funded through the Legal Department, Internal Audit, and Human Resources.

### Standards and Procedures

∗     OSI's then-current Code of Ethics and Conduct (the "Code") was not derived from the results of corporate compliance risk assessment, and lacked several best practices. OSI's corporate policies more generally lacked organization, uniformity and many best practices.

\*    No compliance area within the Code was specific to government contracting or anti-corruption.

\*    The Code was not accessible, being written above the recommended 6th-8th grade level, and without comprehension aids such as Q&As and FAQs.

\*    The Code referenced an ethics hotline, but required an employee to contact a Human Resources representative in order to access the number.

\*    The Code mentioned "ethics" several times, but never gave any instruction on specific corporate values or the definition of what it meant to be "ethical."

\*    ***The Code lacked a message from the CEO on the importance of the Code within OSI and the corporate commitment to integrity.***

\*    The non-retaliation statement was relatively hidden on the second-to-last page of the Code, and only applied to employees who reported – not to those who participated in an investigation.

\*    The "Doing Business With the Government Policy" lacked information on mandatory disclosure, including what must be disclosed, and the process for raising issues.

\*    ***There was no policy on investigations:  who would conduct them, or other important process steps.***

\*    There was no formal independent policy on whistleblowing and retaliation. According to the Report, "it is critical to set forth in a corporate policy how employees may make reports, what the retaliation policy is, and how to report retaliation if it occurs."

\*    The Code was not shared externally, with vendors, suppliers, and independent contractors, as called for by best practices.

∗    The consulting firm did not review any policy that specifically related to timely disclosure of non-compliance or improper conduct related to government contracts, even though the FAR requires Rapiscan to have an internal control system that included those features.

## Risk Assessment

∗    ***OSI had no formal process to assess the risk of misconduct or criminal conduct in the organization. This risk assessment process is a fundamental requirement of the FSG and FAR.***

## Training and Education

∗    Training efforts on compliance and ethics topics had dramatically increased only in the six months preceding the Report (*i.e.*, since April 2013).

∗    Not enough effort was put into retaliation training.

∗    Informal periodic communications had only recently begun that calendar year (*i.e.*, 2013).

## Monitoring, Auditing & Investigations

∗    ***OSI did not ask employees about their knowledge of misconduct in annual performance reviews, annual certification of the Code or exit interviews.***

∗    ***There was no written policy or procedure to designate authority for investigations or for the elevation of suspected misconduct to legal counsel or the DC.***

## Incentives & Discipline

∗    Misconduct was not benchmarked against the Code or policies and procedures.

∗    OSI had no incentives for meaningful participation in the Compliance and Ethics Program.  According to the Report, this was a "critical deficiency."  Absent performance measures tied

59

to such participation, there was no incentive to comply with the program.

[Emphasis added.]

150.   These deficiencies and others cited in the Report are clear evidence of the dereliction of duties by Defendants, which led to the breakdown in internal controls and compliance evidenced above.

151.   Furthermore, because the Board knowingly failed to perform the bare minimum amount of work necessary to monitor the Company, and because the Board knowingly allowed the Company to operate without a formal compliance structure capable of identifying compliance risks, the Board also failed to properly monitor the public statements of Defendants Chopra and Mehra.  Thus, the breach of fiduciary duty by Good, Luskin, Ballhaus, and Feinberg in totally abandoning their duty to oversee the Company caused OSI, through its agents Chopra and Mehra, to violate the federal securities laws by making false statements.

## VI.   Accounting Violations

152.   The Individual Defendants' false statements and omissions related to the ATR software and the $67.1 million contract for 620DVs caused OSI's financial statements to be materially false and misleading in violation of GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not

include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10- 01(a).

153.   To date, OSI has recorded at least $5.8 million in charges associated with the ATR contract and at least $2.7 million in charges related to the 620DV contract.  OSI, has not, however, accounted for these charges in accordance with GAAP.   As a result, OSI's financial statements were materially misstated throughout the Relevant Period, including the Company's assets, income from operations, income before income taxes, net income, and earnings per share.

## A.   Failure to Properly Account for the Material Charges Associated with the Wrongdoing

154.   As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, *Objectives of Financial Reporting by Business Enterprises* ("SFAC 1"), one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance for the period being presented.  Specifically, SFAC 1 states that financial reporting "should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance."

155.   Moreover, "the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility."  (AU §110.03.)

156.   The accrual method of accounting requires that, when revenues are recorded, costs associated with those revenues also be recorded.   As

provided in SFAC No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("CON 5"), the Company was required to record the appropriate level of expenses as it was generating revenue. This method required OSI to record a liability at the end of the period in which the liability was incurred.  Paragraph 35 of SFAC No. 6, *Elements of Financial Statements* ("CON 6") defines liabilities as "**probable** future sacrifices of economic benefits arising from **present obligations** of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events." [Emphasis added.]  In this context, "probable" is "used with its usual general meaning, rather than in a specific accounting or technical sense (such as that in [SFAS 5,] par. 3), and refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain nor proved."  Similarly, the word "obligations" is "broader than *legal obligations*.  It is used with its usual general meaning to refer to duties imposed legally or socially; to that which one is bound to do by contract, promise, moral responsibility, and so forth (*Webster's New World Dictionary*, p. 981)." (Italics in original).

157.   Under CON 6, liability arises if:  (1) there is "a present duty or responsibility to one or more other entities that entails settlement by probable future transfer or use of assets at a specified or determinable date, on occurrence of a specified event, or on demand," (2) "the duty or responsibility obligates a particular entity, leaving it little or no discretion to avoid the future sacrifice," and (3) "the transaction or other event obligating the entity has already happened."

158. In Accounting Standards Codification 450 ("ASC 450"), *Contingencies*, GAAP provides that:

An estimated loss from a loss contingency **shall be accrued by a charge to income** if both of the following conditions are met:

a.     Information available prior to issuance of the financial statements indicates that **it is probable that an asset had been impaired or a liability had been incurred** at the date of the financial statements . . . and

b.     **The amount of loss can be reasonably estimated.** [Emphasis added.]

159.   Statement of Financial Accounting Standards ("SFAS 146"), *Accounting for Costs Associated with Exit or Disposal Activities* requires that costs associated with the termination of a contract composed of either (a) costs to terminate the contract before the end of its term or (b) costs that will continue to be incurred under the contract for its remaining term without economic benefit to the entity **be recognized and measured at their fair value in the reporting period in which the entity terminates the contract in accordance with the contract terms**. SFAS 146 requires that such costs be recognized and measured at their fair value in the period in which the liability is incurred or, in the unusual circumstance in which fair value cannot be reasonably estimated, the liability shall be recognized initially in the period in which fair value can be reasonably estimated.

160.   SFAS No. 154, *Accounting Changes and Error Corrections*, which was incorporated in ASC 250, *Accounting Changes and Error Corrections*, states:

A change in accounting estimate shall be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both.  **A change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of**

63

**prior periods or by reporting pro forma amounts for prior periods**.

**Change in accounting estimate** - a change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities. A change in accounting estimate is a necessary consequence of the assessment, in conjunction with the periodic presentation of financial statements, of the present status and expected future benefits and obligations associated with assets and liabilities. Changes in accounting estimates result from **new information**.

[Emphasis added.]

161. In stark contrast to SFAS 154, ASC 250, which incorporated Accounting Principles Board Opinion No. 20 ("APB 20"), *Accounting Changes*, provides, in relevant part, that:

Restating financial statements of prior periods may dilute public confidence in financial statements and may confuse those who use them. Financial statements previously prepared on the basis of accounting principles generally accepted at the time the statements were issued should therefore be considered final except for changes in the reporting entity or corrections of errors.

\* \* \*

Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.

\* \* \*

If a change or correction has a material effect on income before extraordinary items or on net income of the current period before the effect of the change, the treatments and disclosures described in this Opinion should be followed.

162.   APB 20 states that "[a]ny error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."

163.   Based on the foregoing, below is a summary of the charges recorded in OSI's financial statements related to the cancellation of the ATR software contract and the cancellation of the 620DV contract between second quarter of fiscal year 2012 and third quarter of fiscal year 2014:

| Quarter Ended | Reporting Period | ATR-Related Charges | 620DV-Related Charges |
|---|---|---|---|
| December 31, 2011 | 2Q 2012 | $0 | $0 |
| March 31, 2012 | 3Q 2012 | $0 | $0 |
| June 30, 2012 | 4Q 2012 | $0 | $0 |
| September 30, 2012 | 1Q 2013 | $0 | $0 |
| December 31, 2012 | 2Q 2013 | $2.7 million | $0 |
| March 31, 2013 | 3Q 2013 | $0 | $0 |
| June 30, 2013 | 4Q 2013 | $1.5 million | $0 |
| September 30, 2013 | 1Q 2014 | $1.6 million | $0 |
| December 31, 2013 | 2Q 2014 | $0 | $0.9 million |
| March 31, 2014 | 3Q 2014 | $0 | $1.8 million |

164.   The Individual Defendants' accounting for these costs was improper and in violation of GAAP for the following reasons:

a.     The Individual Defendants violated ASC 250, APB 20, SFAS 154, SFAS 5, SFAS 146, CON 5, CON 6, and ASC 450 because they failed to record the charges during the Relevant Period *when they became probable and estimable*.   Indeed, as detailed herein, the Individual Defendants were aware from the beginning of the Relevant Period that they would be unable to meet the TSA's directive regarding ATR software in a timely manner.  Furthermore, the Individual Defendants knew or should have known throughout the Relevant Period — and had actual knowledge as of the quarter ending

December 31, 2012 — that the Company was using unapproved, untested, and mislabeled Chinese parts in its 620DV units.

b.     The Individual Defendants violated FAS 146 because they failed to concurrently recognize the entirety of the charges. Rather than "spreading" portions of the ATR contract charge over several reporting periods, the Individual Defendants were required to disclose and record the full $5.8 million when the charge became probable and estimable — *i.e.*, during the quarter ending December 31, 2011. Likewise, the Individual Defendants were required to disclose and record the full $2.7 million 620DV contract charge once it became probable and estimable — *i.e.*, at the very latest once they acquired actual knowledge of the issue in the quarter ending June 30, 2013.

c.     The Individual Defendants improperly classified the charges as "impairment, restructuring and other charges," instead of the appropriate line item in the Company's financial statements. The Individual Defendants were aware that investors and analysts considered "impairment, restructuring and other charges" one-time costs and that such expenses were not as significant to OSI's stock price as metrics such as income from operations, income before income taxes, net income, and earnings per share. By classifying the charges as "impairment, restructuring and other charges," **the Individual Defendants were able to consistently report "record financial results" that met or exceeded analysts' expectations during the entire Relevant Period, driving the stock price significantly, but artificially, higher**.

d.     The Individual Defendants violated SFAS 154, ASC 250, and APB 20 because they accounted for the charges as "changes in accounting estimates," rather than as errors. No new information has

been discovered, since the Individual Defendants became aware that these contracts would be terminated, that would justify accounting for these charges as "changes in accounting estimates."   Rather, these charges should have been accounted for as errors and OSI should have restated its Relevant Period financial statements.

165.   If Defendants would have recorded the $5.8 million and the $2.7 million charges associated with the "show cause" letters in accordance with GAAP, the effect on the Company's quarterly financial statements in any one quarter during the Relevant Period would have been material:

a.   **2Q12 (quarter ending December 31, 2011)**:  At the time that OSI's 2Q12 financial statement was issued, the Individual Defendants were aware that (i) Rapiscan was suffering significant technological difficulties in the development of ATR software for which costs should not have been capitalized; (ii) the technological difficulties were causing severe delays; and (iii) Rapiscan would be unable to complete the contract at all.  Accordingly, under GAAP, the Individual Defendants should have caused OSI to record a $5.8 million charge related to costs associated with the ATR contract. The Individual Defendants did not record such a charge.  Had they done so, the effect on OSI's financial statement for the quarter ending December 31, 2011 would have been as follows:

| December 31, 2011 – 2nd Quarter 2012 | | | | | |
|---|---|---|---|---|---|
| *(in thousands except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operations | $18,299 | $(5,800) | $12,499 | $(5,800) | -31.70% |
| Income before Income Taxes | $17,578 | $(5,800) | $11,778 | $(5,800) | -33.00% |
| Net Income | $12,301 | $(5,800) | $6,501 | $(5,800) | -47.15% |

| December 31, 2011 – 2nd Quarter 2012 | | | | | |
|---|---|---|---|---|---|
| *(in thousands except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Basic Earnings Per Share | $0.62 | | $0.33 | $(0.29) | -47.15% |
| Diluted Earnings Per Share | $0.61 | | $0.32 | (0.29) | -47.15% |

b.     **3Q12 (quarter ending March 31, 2012)**:  At the time that OSI's 3Q12 financial statement was issued, the Individual Defendants were aware that (i) Rapiscan was suffering significant technological difficulties in the development of ATR software for which costs should not have been capitalized; (ii) the technological difficulties were causing severe delays; and (iii) Rapiscan would be unable to complete the contract at all.  Accordingly, under GAAP, the Individual Defendants should have caused OSI to record a $5.8 million charge related to costs associated with the ATR contract.  The Individual Defendants did not record such a charge.  Had they done so, the effect on OSI's financial statement for the quarter ending March 31, 2012 would have been as follows:

| March 31, 2012 – 3rd Quarter 2012 | | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operations | $18,205 | $(5,800) | $12,405 | $(5,800) | -31.86% |
| Income before Income Taxes | $17,431 | $(5,800) | $11,631 | $(5,800) | -33.27% |
| Net Income | $12,575 | $(5,800) | $6,775 | $(5,800) | -46.12% |
| Basic Earnings Per Share | $0.63 | | $0.34 | $(0.29) | -46.12% |
| Diluted Earnings Per Share | $0.62 | | $0.33 | $(0.29) | -46.12% |

c.     **4Q12 (quarter ending June 30, 2012)**:  At the time that OSI's Fiscal Year End 2012 financial statement was issued, the

68

Individual Defendants were aware that (i) Rapiscan was suffering significant technological difficulties in the development of ATR software for which costs should not have been capitalized; (ii) the technological difficulties were causing severe delays; and (iii) Rapiscan would be unable to complete the contract at all. Accordingly, under GAAP, the Individual Defendants should have caused OSI to record a $5.8 million charge related to costs associated with the ATR contract.  The Individual Defendants did not record such a charge.  Had they done so, the effect on OSI's financial statement for the quarter ending June 30, 2012 would have been as follows:

| (in thousands, except EPS) | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
|---|---|---|---|---|---|
| **June 30, 2012 – 4th Quarter 2012** | | | | | |
| Income from Operations | $21,826 | $(5,800) | $16,026 | $(5,800) | -26.57% |
| Income before Income Taxes | $20,181 | $(5,800) | $14,381 | $(5,800) | -28.74% |
| Net Income | $15,911 | $(5,800) | $10,111 | $(5,800) | -36.45% |
| Basic Earnings Per Share | $0.81 | | $0.51 | $(0.30) | -36.45% |
| Diluted Earnings Per Share | $0.78 | | $0.50 | $(0.28) | -36.45% |

d.     **1Q13 (quarter ending September 30, 2012)**:  As discussed above, the Individual Defendants should have caused OSI to record a $5.8 million charge related to costs associated with the ATR contract.   Had they done so, the effect on OSI's financial statement for the quarter ending September 30, 2012 would have been as follows:

| | September 30, 2012 – 1st Quarter 2013 | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operations | $10,114 | $(5,800) | $4,314 | $(5,800) | -57.35% |
| Income before Income Taxes | $9,017 | $(5,800) | $3,217 | $(5,800) | -64.32% |
| Net Income | $6,339 | $(5,800) | $539 | $(5,800) | -91.50% |
| Basic Earnings Per Share | $0.32 | | $0.03 | $(0.29) | -91.50% |
| Diluted Earnings Per Share | $0.31 | | $0.03 | $(0.28) | -91.50% |

e.   **2Q13 (quarter ending December 31, 2012)**:  During the quarter, the Individual Defendants recorded a $2.7 million charge associated with the ATR show cause letter, and the cancellation of the ATR software contract.  Nevertheless, under GAAP, they should have recorded an additional $3.1 million charge so that the full $5.8 million charge was incurred.  Had the Individual Defendants done so, the effect on OSI's financial statement for the quarter ending December 31, 2012 would have been as follows:

| | December 31, 2012 – 2nd Quarter 2013 | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operations | $18,678 | $(3,100) | $15,578 | $(3,100) | -16.60% |
| Income before Income Taxes | $17,293 | $(3,100) | $14,193 | $(3,100) | -17.93% |
| Net Income | $12,421 | $(3,100) | $9,321 | $(3,100) | -24.96% |
| Basic Earnings Per Share | $0.62 | | $0.47 | $(0.15) | -24.96% |
| Diluted Earnings Per Share | $0.60 | | $0.45 | $(0.15) | -24.96% |

f.   **3Q13 (quarter ending March 31, 2013)**:   The Individual Defendants had previously recorded a $2.7 million charge

associated with the ATR show cause letter, and the cancellation of the ATR software contract.  Nevertheless, under GAAP, they should have recorded an additional $3.1 million charge so that the full $5.8 million charge was incurred.  Had the Individual Defendants done so, the effect on OSI's financial statement  for the quarter ending March 31, 2013 would have been as follows:

| | March 31, 2013 – 3rd Quarter 2013 | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operation | $19,414 | $(3,100) | $16,314 | $(3,100) | -15.97% |
| Income before Income Taxes | $18,073 | $(3,100) | $14,973 | $(3,100) | -17.15% |
| Net Income | $13,529 | $(3,100) | $10,429 | $(3,100) | -22.91% |
| Basic Earnings Per Share | $0.68 | | $0.52 | $(0.16) | -22.91% |
| Diluted Earnings Per Share | $0.66 | | $0.51 | $(0.15) | -22.91% |

g.    **4Q13 (quarter ending June 30, 2013)**:  During the quarter, the Individual Defendants recorded a $1.5 million charge associated with the ATR show cause letter, and the cancellation of the ATR software contract (and the Individual Defendants had previously recorded a $2.7 million charge related to the same).  Nevertheless, under GAAP, they should have recorded an additional $1.6 million charge, so that the full $5.8 million charge was incurred. Additionally, at the time that OSI's Fiscal Year End 2013 financial statements were issued, the Individual Defendants were aware that, in violation of its U.S. government contracts, Rapiscan had used unapproved Chinese parts in its checkpoint baggage and parcel scanners, including the 620DV.  Accordingly, under GAAP, the Individual Defendants should have caused OSI to record at least a $2.7 million charge related to

71

costs associated with disclosure of the violation, including replacement of the improper parts and resolution of an administrative proceeding with the U.S. government. Had the Individual Defendants properly recorded the $1.6 million ATR-related charge, along with the $2.7 million checkpoint scanner charge, the effect on OSI's financial statement for the quarter ending on June 30, 2013 would have been as follows:

| | June 30, 2013 – 4th Quarter 2013 | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Income from Operations | $26,232 | $(4,300) | $21,932 | $(4,300) | -16.39% |
| Income before Income Taxes | $25,032 | $(4,300) | $20,732 | $(4,300) | -17.18% |
| Net Income | $11,847 | $(4,300) | $7,547 | $(4,300) | -36.30% |
| Basic Earnings Per Share | $0.59 | | $0.38 | $(0.21) | -36.30% |
| Diluted Earnings Per Share | $0.58 | | $0.37 | $(0.21) | -36.30% |

h.  **1Q14 (quarter ending September 30, 2013)**:  As detailed above, at the time that OSI's 1Q14 financial statements were issued, the Individual Defendants were aware that, in violation of its U.S. government contracts, Rapiscan had used unapproved Chinese parts in its checkpoint baggage and parcel scanners, including the 620DV.  Accordingly, under GAAP, the Individual Defendants should have caused OSI to record at least a $2.7 million charge related to costs associated with disclosure of the violation, including replacement of the improper parts and resolution of an administrative proceeding with the U.S. government.  Had the Individual Defendants done so, the effect on OSI's financial statement

for the quarter ending September 30, 2013 would have been as follows:

| (in thousands, except EPS) | September 30, 2013 – 1st Quarter 2014 | | | | |
| | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
|---|---|---|---|---|---|
| Income from Operations | $10,473 | $(2,700) | $7,773 | $(2,700) | -25.78% |
| Income before Income Taxes | $9,003 | $(2,700) | $6,303 | $(2,700) | -29.99% |
| Net Income | $6,394 | $(2,700) | $3,694 | $(2,700) | -42.23% |
| Basic Earnings Per Share | $0.32 | | $0.18 | $(0.14) | -42.23% |
| Diluted Earnings Per Share | $0.31 | | $0.18 | $(0.13) | -42.23% |

i.  **2Q14 (quarter ending December 31, 2013)**:  During the quarter, the Individual Defendants recorded a $0.9 million charge related to costs associated with disclosure of the violation, including replacement of the improper parts and resolution of an administrative proceeding with the U.S. government.  Nevertheless, under GAAP, they should have recorded at least an additional $1.8 million charge so that the full $2.7 million charge was incurred.  Had the Individual Defendants done so, the effect on OSI's financial statements for the quarter ending December 31, 2013 would have been as follows:

| (in thousands, except EPS) | December 31, 2013 – 2nd Quarter 2014 | | | | |
| | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
|---|---|---|---|---|---|
| Income from Operations | $22,029 | $(1,800) | $20,229 | $(1,800) | -8.17% |
| Income before Income Taxes | $20,526 | $(1,800) | $18,726 | $(1,800) | -8.77% |
| Net Income | $14,573 | $(1,800) | $12,773 | $(1,800) | -12.35% |

| | December 31, 2013 – 2nd Quarter 2014 | | | | |
|---|---|---|---|---|---|
| *(in thousands, except EPS)* | Reported | Misstatement | Adjusted | Impact ($) | Impact (%) |
| Basic Earnings Per Share | $0.73 | | $0.64 | $(0.09) | -12.35% |
| Diluted Earnings Per Share | $0.71 | | $0.62 | $(0.09) | -12.35% |

166.   The Individual Defendants knew or recklessly disregarded that OSI's financial statements during the Relevant Period were materially false and misleading and not in compliance with GAAP and SEC Rules because, among other things:

a.   The Individual Defendants failed to record the known charges associated with both the ATR software issue and the 620DV contract issue in the reporting period in which such liabilities became probable and estimable, in violation of GAAP.

b.   The Individual Defendants failed to concurrently recognize the entirety of the charges, rather than "spreading" portions of the charges over several reporting periods, in violation of GAAP.

c.   The Individual Defendants improperly classified the charges as "impairment, restructuring and other charges," rather than properly applying the charges to the appropriate line items in OSI's financial statements, to mislead investors into not considering these charges in the stock price.

d.   The Individual Defendants improperly recorded such charges as changes in accounting estimates (via prospective application) rather than as errors (via retrospective application) in violation of GAAP, given that no new information had been located that would justify such accounting treatment.

**B.      Additional GAAP and SEC Violations**

167.   In addition to the false statements and omissions related to the Individual Defendants' failure to properly account for the charges associated with their wrongdoing, the Company's SEC filings throughout the Relevant Period contained numerous additional material violations of GAAP and SEC rules and regulations.

168.   SEC regulations require that certain disclosures supplement a company's quarterly and annual financial statements to help investors better understand a company's financial condition.   Specifically, SEC Regulation S-K, Item 303, requires that each annual Form 10-K and quarterly Form 10-Q include a narrative explaining the financial statements and the changes in financial condition of the company ***through the eyes of management***.

169.   The specific disclosure requirement of Item 303 states:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

170.   Accordingly, OSI was required under GAAP and SEC rules, including APB No. 22, *Disclosure of Accounting Policies*, to disclose in detail OSI's significant accounting policies, including the basis for the recognition of revenue, software development costs, and impairment, restructuring and other charges in the footnotes of its financial statements in each of its publicly issued Forms 10-K and 10-Q during the Relevant Period.  The requirement set forth in SAB 104 states as follows:

75

A registrant should disclose its accounting policy for the recognition of revenue pursuant to [APB 22].  Paragraph 12 thereof states that "the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue . . . ."  Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy.

171.   The following statements in OSI's SEC filings during the Relevant Period related to critical accounting policies and estimates were materially false and misleading or omitted information necessary to make them not misleading:

**Critical Accounting Policies and Estimates**

The following discussion and analysis of our financial condition and results of operations is based on ***our Consolidated Financial Statements, which have been prepared in conformity with accounting principles generally accepted in the United States.***  Our preparation of these Consolidated Financial Statements requires us to make judgments and estimates that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  ***We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances.***  As a result, actual results may differ from such estimates.  Our senior management has reviewed these critical accounting policies and related disclosures with the Audit Committee of our Board of Directors.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of

America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

[Emphasis added.]

172.   These statements were false and misleading when made because the Individual Defendants had not disclosed that (1) the ATR software issues had been known for months before November 2012; and (2) the use of unapproved Chinese components in Rapiscan's checkpoint baggage scanners was known during the second quarter of fiscal year 2013.

173.   The following Relevant Period statements related to  Rapiscan's backlog (when considered with the Company's revenue recognition policies) were materially false and misleading or omitted information necessary to make them not misleading:

**Revenue Recognition**

The Company recognizes revenue upon shipment of products when title and risk of loss passes, and when terms are fixed and collection is probable.  The portion of revenue for the sale attributable to installation is deferred and recognized when the installation service is provided.  ***In an instance where terms of sale include subjective customer acceptance criteria, revenue is deferred until we have achieved the acceptance criteria.***  Concurrent with the shipment of the product, the Company accrues estimated product return reserves and warranty expenses.  Critical judgments made by management related to revenue recognition include the determination of whether or not customer acceptance criteria are perfunctory or inconsequential.  The determination of whether or not customer acceptance terms are perfunctory or inconsequential impacts the amount and timing of revenue recognized.  Critical judgments also include estimates of warranty reserves, which are established based on historical experience and knowledge of the product under warranty.

[Emphasis added.]

174. Additionally, the Individual Defendants falsely touted the Company's backlog on the October 23, 2013 conference call, less than one month after securing the TSA's $67.1 million contract.   For example, Defendant Chopra stated:

> The strong results at the onset of this fiscal year puts us in a very good position to build upon this momentum for the remainder of the year. ***Reviewing the highlights for the quarter, starting with our Security division*** – Rapiscan Systems, where revenues increased 17% to $97 million, ***with bookings of approximately $112 million***.

[Emphasis added.]

175.   On the same earnings conference call, Defendant Edrick stated:

> As mentioned on last quarter's call, we were excited about the prospects for both revenue and earnings growth in fiscal 2014, and we are quite pleased with how this fiscal year has begun.
>
> * * *
>
> Third, ***our security bookings were very solid, with a book-to-bill ratio of security, excluding turnkey, of 1.7. Our strong bookings and backlog position us well in our Security*** and Opto businesses.

[Emphasis added.]

176. These statements were false and misleading when made because (1) the Individual Defendants were aware, beginning in the fourth quarter of fiscal year 2013 (*i.e.*, quarter ending June 30, 2013), of the use of unapproved Chinese parts in the checkpoint baggage scanners that Rapiscan had intentionally mislabeled in an attempt to avoid detection; and (2) the Individual Defendants misled the market by including in the backlog as of September 30, 2013, the TSA's $67.1 million order for 550 620DVs when the Individual Defendants knew that such contract would

never materialize.  As Individual Defendants were aware that the TSA had not approved the parts in use, the Individual Defendants were aware that the acceptance criteria of the Company's revenue recognition policy would **never be met**.

177.  The following statement in OSI's SEC filings during the Relevant Period related to goodwill and intangible assets was materially false and misleading or omitted information necessary to make it not misleading:

**Goodwill and Intangible Assets**

***Software development costs for software products incurred before establishing technological feasibility are charged to operations.***  Software development costs incurred after establishing technological feasibility are capitalized on a product-by-product basis until the product is available for general release to customers at which time amortization begins.  Annual amortization, charged to cost of goods sold, is the greater of (i) the amount computed using the ratio that current gross revenues for a product bear to the total current and anticipated future gross revenues for that product and (ii) the straight-line method over the remaining estimated economic life of the product.

[Emphasis added.]

178.  This statement was false and misleading when made because, despite their awareness that technological feasibility of the ATR software had not been established, the Individual Defendants wrongfully **capitalized** the ATR software development costs.  This allowed the Individual Defendants to improperly avoid recording these expenses in OSI's ongoing operations and to create the impression with investors that: (1) OSI would meet the TSA's extended deadline and not be terminated for default (capitalizing the costs indicated that technological feasibility was established); and (2) OSI could delay the recognition of these costs into

expenses.  Additionally, as OSI recorded the expenses associated with the software development in "impairment, restructuring and other charges," they were excluded from GAAP net income and earnings per share, metrics closely monitored by analysts and investors.

179.  The following statements in OSI's 2013 Form 10-K related to impairment, restructuring, and other charges were materially false and misleading or omitted information necessary to make it not misleading:

**Impairment, Restructuring and Other Charges**

The Company consolidates processes and facilities of its subsidiaries to better align with demand by its customers and thereby improve its operational efficiencies.  The associated charges, and other non-recurring charges and impairment of assets, are recognized as impairment, restructuring and other charges in the Consolidated Financial Statements.

\* \* \*

***For the past several years we have endeavored to align our global capacity and infrastructure with demand by our customers and fully integrate acquisitions, thereby improving our operational efficiency.  These activities included reducing excess workforce and capacity, consolidating and relocating certain manufacturing facilities and reviewing the value of certain technologies and product lines.***  The overall objectives of the restructuring activities were to lower costs and better utilize our existing manufacturing capacity. During fiscal 2011 through 2013, ***we continued these efforts to further increase operating efficiencies, although we implemented fewer changes than those made in prior fiscal years.***  Our efforts have helped enhance our ability to improve operating margins, retain and expand existing relationships with customers and attract new business. We may utilize similar measures in the future to realign our operations to further increase our operating efficiencies.  The effect of these efforts may materially affect our future operating results.

\* \* \*

In response to challenging worldwide economic conditions, the Company continued to optimize its cost structure by reducing excess workforce and facilities and consolidating and relocating certain manufacturing facilities. In addition, during fiscal 2013, as a result of a contract settlement with the Transportation Security Agency (TSA) related to the Rapiscan Secure 1000SP Advanced Imaging Technology system and associated Automated Target Recognition software and our related agreement with the U.S. Department of Homeland Security (DHS), the Company incurred charges, including the write-off of inventory, removal and storage costs for products previously sold to the TSA and legal costs; and recognized the impairment of related capitalized software development costs.

\* \* \*

*Fiscal 2013 Compared with Fiscal 2012.* During fiscal 2013, we incurred $8.0 million of impairment, restructuring and other charges primarily related to headcount reductions and facility consolidation, and ***in conjunction with our agreement with the Transportation Security Agency (TSA) related to the Rapiscan Secure 1000SP Advanced Imaging Technology system and associated Automated Target Recognition software and our related agreement with the U.S. Department of Homeland Security (DHS)***.

[Emphasis added.]

180. This statement was false and misleading when made because the Individual Defendants had not disclosed that (1) the ATR software issues had been known for months before November 2012; and (2) the use of unapproved Chinese components in Rapiscan's checkpoint baggage scanners was known during the second quarter of fiscal year 2013.

181. The Individual Defendants have misled and continue to mislead investors by describing and recording these costs in the "impairment, restructuring and other charges" line item of the Company's income statements. Such expenses have been incorrectly described by the

Individual Defendants as "**activities included reducing excess workforce and capacity, consolidating and relocating certain manufacturing facilities and reviewing the value of certain technologies and product lines**" which are supposedly designed to "**increase operating efficiencies.**" [Emphasis added.]

**VII.  Insider Trading**

182.  Based on the material, non-public information that OSI had serious, ongoing problems relating to its Rapiscan machines and the TSA, Defendants Chopra, Mehra, and Good sold OSI common stock while at or near record high prices due to the Company's false statements:

| Name | Title | Trade Date | Shares Sold | Sale Price | Gross Proceeds |
|---|---|---|---|---|---|
| Defendant Deepak Chopra | President and CEO, Board member | 9/10/12 | 5,198 | $74.25 | $385,952 |
| | | 9/4/12 | 15,196 | $73.79 | $1,121,313 |
| | | 8/15/12 | 35,340 | $73.73 | $2,605,618 |
| | | 8/14/12 | 10,341 | $72.39 | $748,585 |
| | | 5/23/12 | 20,000 | $63.96 | $1,279,120 |
| | | | | **TOTAL:** | **$6,140,588** |
| Defendant Ajay Mehra | Rapiscan President and Board Member | 9/6/12 | 3,750 | $73.88 | $277,050 |
| | | 9/5/12 | 5,997 | $73.91 | $443,238 |
| | | 8/16/12 | 27,053 | $73.43 | $1,986,502 |
| | | 3/6/12 | 16,000 | $59.00 | $944,000 |
| | | 3/1/12 | 23,452 | $58.53 | $1,372,587 |
| | | | | **TOTAL:** | **$5,023,377** |

| Name | Title | Trade Date | Shares Sold | Sale Price | Gross Proceeds |
|---|---|---|---|---|---|
| | | | | | |
| Defendant Alan Edrick | Executive VP and CFO | 03/14/12 | 2,700 | $61.51 | $166,070 |
| | | 03/15/12 | 2,500 | $61.27 | $153,173 |
| | | 03/21/12 | 7,300 | $61.46 | $448,680 |
| | | 03/23/12 | 5,000 | $61.70 | $308,500 |
| | | 08/13/12 | 2,752 | $71.50 | $196,768 |
| | | 08/14/12 | 7,500 | $73.74 | $553,050 |
| | | 09/04/12 | 4,883 | $74.10 | $361,830 |
| | | 09/07/12 | 8,000 | $74.56 | $596,480 |
| | | 09/10/12 | 1,751 | $75.10 | $131,500 |
| | | | | **TOTAL:** | **$2,916,051** |
| | | | | | |
| Defendant Steven Good | Board Member | 8/30/12 | 1,000 | $73.50 | $73,500 |
| | | 8/14/12 | 5,437 | $73.79 | $401,196 |
| | | 4/26/12 | 3,813 | $63.00 | $240,219 |
| | | | | **TOTAL:** | **$714,915** |
| | | | | | |
| | | **Grand Total:** | **214,963** | | **$14,794,931** |

183.    These stock sales are particularly egregious given that the Individual Defendants admitted that they were aware of the ongoing issues with the Rapiscan devices "months" before that information was publicly disclosed.  The sales above are all prior to the November 14, 2012 disclosure and the huge, 30% drop in OSI's stock price.  The above three Board members and Edrick had access to this inside information, yet nevertheless

83

sold 214,963 shares of stock for proceeds of nearly $14.8 million.  These four Individual Defendants used their position of trust and confidence with the Company to trade on material insider information that was not disclosed to the public and improperly made trades because they were motivated, in whole or in part, by the substance of the material proprietary information.  If these Defendants had waited until the material, inside information was known, their sales would have netted them millions less than they received.

184.  By knowingly taking advantage of OSI's artificially high trading price, Defendants Chopra, Mehra, Edrick and Good put their own interests over those of the Company, and derived a benefit not shared equally with other OSI shareholders.  As a result, Defendants Chopra, Mehra, Edrick and Good have been unjustly enriched through their breaches of fiduciary duties.

**DAMAGES TO OSI**

185.  OSI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

186.  As a direct and proximate result of the Individual Defendants' misconduct, OSI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

    a.    legal fees associated with the lawsuits filed against OSI for violations of the federal securities laws;

    b.    loss of reputation and goodwill, and a "liar's discount" that will plague OSI's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

    c.    amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations; and

    d.    loss of revenues and profits.

187.   In particular, the Individual Defendants' actions have subjected the Company to two Congressional inquiries, two show-cause letters from the TSA, and two debarment investigations by the DHS — all within the span of 12 months.  In addition, the Company received an inquiry from FINRA, the Financial Industry Regulatory Authority, regarding the events surrounding the November 9, 2012 show-cause letter.  OSI lost two lucrative contracts with the TSA, one of its major customers.  As a result, OSI has already spent millions of dollars, with the amount continuing to grow.  In addition, the Company has been forced to expend considerable amounts of time and money defending itself and its officers and directors against the class action lawsuit for securities fraud.

188. According to OSI's Form 10-K filed on August 16, 2013, OSI expensed $3.2 million in charges related to the terminated TSA contract as of June 30, 2013, and $1.1 million in impairment of software development costs for the same period.  OSI also expensed $781,000 in employee termination costs in its Security division.  According to OSI's Form 10-Q filed on May 2, 2014, OSI expensed an additional $4.3 million in charges related to the terminated TSA contract and other contract issues with the TSA and other U.S. government agencies during the nine-month period ending March 31, 2014.   These costs include removal, storage, and refurbishing costs for products previously sold to the TSA as required by the termination, legal, and other costs.  In the same period, OSI expensed $364,000 in charges related to class action litigation.  OSI also expensed $822,000 in employee termination costs in its Security division, incurred as a result of management restructuring.

## DERIVATIVE AND DEMAND ALLEGATIONS

189. Plaintiffs bring this action derivatively in the right and for the benefit of OSI to redress the breaches of fiduciary duties and other

violations of law by the Individual Defendants.  OSI is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.   Plaintiffs will adequately and fairly represent the interests of OSI and its shareholders in enforcing and prosecuting its rights.

191.   Plaintiffs are and were owners of OSI common stock during the Relevant Period when Individual Defendants' wrongful course of conduct alleged herein occurred, and remain stockholders of the Company.

192.   At the time this complaint was filed, the Board consisted of the following six individuals:  Defendants Chopra, Ballhaus, Feinberg, Good, Luskin, and Mehra.

193.   Because of their Board membership and/or executive positions with the Company, the Individual Defendants had access to the undisclosed information about OSI's ongoing issues with its Rapiscan machines and the related issues with its TSA contracts.

194.   The Individual Defendants face a substantial likelihood of personal liability in this action, *inter alia*:

    a.  as a result of their failure, as directors and/or officers of OSI, to assure that a reliable system of internal controls was in place and functioning effectively;

    b.  for their failure to assure that a reliable disclosure system was in place and functioning effectively;

    c.  for their violations of federal securities laws; and

    d.  for their illicit insider trading proceeds.

195.   The Board was on notice that the TSA had raised serious issues with OSI's management, violations of contractual provisions, and legal violations relating to acquiring equipment from non-approved countries. Moreover, the Individual Defendants failed to take the necessary steps to

1   prevent and/or remedy those deficiencies, proximately causing millions of

2   dollars in damages to the Company.

3       196.   A true and correct copy of the original complaint was delivered

4   to the Company by Plaintiffs before its filing with this Court.

5       197.   Plaintiffs have not made any demand on the Board to institute

6   this action because such a demand would be a futile, wasteful, and useless

7   act, as set forth below.

8       198.  Demand on the Board is futile because, in breach of their

9   fiduciary duties, OSI's Board members utterly failed to exercise proper

10   control over OSI or to put in place allowed proper compliance control,

11   causing OSI to repeatedly violate federal law.   Each of the Individual

12   Defendants sat on the Board during the Relevant Period, and was

13   responsible for the setting and enforcing of policy.  Because of the severity

14   of the wrongdoings, which led to two contract terminations by the TSA,

15   each Individual Defendant knew or should have known of the underlying

16   facts of those schemes.

17       199.  Demand is futile because at least half of the Board faces a

18   substantial likelihood of liability from the breach of fiduciary duty claims

19   asserted herein.  The Individual Defendants breached their duty of loyalty

20   and good faith to OSI by consciously allowing OSI to operate illegally.

21       200. Each Individual Defendant is incapable of independently and

22   disinterestedly considering a demand to commence and vigorously

23   prosecute this action, for the following reasons:

24   **I.    Defendant Chopra Is Not Independent**

25       201.  Demand is excused as to Chopra because he has served as OSI's

26   President and CEO, pursuant to which he has received substantial

27   monetary compensation and other valuable benefits.  Chopra is also CEO of

28   OSI's major subsidiaries.  Based thereupon, OSI readily admits (including

in the Company's 2013 Proxy Statement filed on October 15, 2013) that Chopra is not "independent" under its own standards, the rules and regulations of the SEC, or pursuant to NASDAQ Stock Market listing rules.

202. Accordingly, demand is excused as to Chopra because of his lack of independence.

## II.    Defendant Mehra Is Not Independent

203. Demand is excused as to Mehra because his principal professional occupation is his employment with OSI as Executive Vice President of the Company and as President of its Rapiscan division, pursuant to which he received and continues to receive substantial monetary compensation and other valuable benefits.  Based thereupon, similar to Chopra, OSI readily admits that Mehra is not "independent" under its own standards, the rules and regulations of the SEC, or pursuant to NASDAQ Stock Market listing rules.

204. Accordingly, demand is excused on Defendant Mehra because of his lack of independence.

## III.    Defendants Chopra, Mehra, and Good Face a Substantial Likelihood of Personal Liability and Are Not Disinterested

205.  Defendants Chopra and Mehra face a substantial likelihood of personal liability because they are the primary architects and beneficiaries of OSI's wrongful schemes.  Both Chopra and Mehra also face substantial likelihood of liability for the breach of fiduciary duty claims asserted herein as well as civil liability in the Securities Fraud Action brought against them and against the Company.

206. Indeed, Chopra and Mehra face a substantial likelihood of liability because the Court recently denied (by Order dated February 27, 2015) their motion to dismiss the securities fraud allegations against them in the related Securities Fraud Action pending in this Court, concluding

that Chopra's and Mehra's comments about the development of the ADR software for Rapiscan "were not vague and optimistic, but specific and materially misleading at the time they were made."[2]  Therefore, Chopra and Mehra are incapable of deciding any demand because of lack of the necessary disinterest.

207.  Moreover, as a result of the actions complained of herein, Defendants Chopra, Mehra, and Good each received a material financial benefit that was not shared by OSI's shareholders in that they were able to reap significant profits through the misuse of non-public Company information to which they were privy as a result of their positions as fiduciaries of the Company.

208.  Defendants Chopra, Mehra, Edrick, and Good sold large quantities — approximately 214,963 shares — of OSI stock based on the material information that OSI had serious and significant problems with the Rapiscan division, including its problems with the TSA contract.  The illicit profits reaped by Chopra, Mehra, Edrick and Good were a direct result of OSI's inflated stock price due to the undisclosed problems described herein.  When this information became public, OSI's stock price fell precipitously.

209.  Because Chopra, Mehra, Edrick and Good each received significant pecuniary benefits from their wrongdoing, they are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action without being influenced by their overriding personal interest.

---

[2]    *Roberti v. OSI Sys., Inc.*, No. 13-cv-09174-MFW-VBK, ECF No. 60 at 13.

210. Accordingly, demand is futile and excused as to Chopra, Mehra, Edrick and Good.

**IV.    Demand Is Futile for the Audit Committee Defendants**

211. During the Relevant Period, Ballhaus, Good, and Luskin served as members of the Audit Committee, which is charged with reviewing OSI's financial statements and internal controls and ensuring compliance with GAAP.  Specifically, the Audit Committee Charter requires Ballhaus, Good, and Luskin to:

   a. "Review with the Company's management, internal auditors and independent auditors the Company's accounting and financial reporting controls."

   b. "Obtain annually in writing from the independent auditors their letter as to the adequacy of such controls."

   c. "Review with the Company's management, internal auditors and independent auditors significant accounting and reporting principles, practices and procedures applied by the Company and management's judgments and estimates in preparing its financial statements."

   d. "Discuss with the independent auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles used in financial reporting."

212. However, Ballhaus, Good, and Luskin breached their fiduciary duties of loyalty and good faith, because they, as Audit Committee members, failed to adopt and implement adequate internal controls, as more particularly described herein.

213. Ballhaus, Good, and Luskin have been responsible for and/or failed to rectify OSI's ongoing internal control issues, even when given notice from the TSA regarding a remediation plan.  Despite these red flags,

the Audit Committee members failed to take necessary action in good faith to correct these ongoing issues.

214.   Furthermore, Ballhaus, Good, and Luskin breached their duties of loyalty and good faith by causing OSI to file financial statements that did not comply with GAAP, as particularly alleged *supra*.   Because they knew and intentionally or recklessly disregarded the GAAP violations, as specifically alleged *supra*, Ballhaus, Good, and Luskin acted in bad faith. Breaches of a director's fiduciary duties of loyalty and good faith cannot be indemnified by OSI.   Thus, the actions of Ballhaus, Good, and Luskin in causing OSI to violate GAAP expose such Defendants to a substantial risk of personal liability for their conduct, thus excusing any demand.

215.   Since Ballhaus, Good and Luskin have a substantial risk of liability for breach of their fiduciary duty of loyalty and good faith, they lack the requisite disinterest to decide a demand.

## V.   The Individual Defendants Have Interconnected Personal and Professional Relationships and Thus Cannot Independently Consider a Demand

216.   Defendants Feinberg and Luskin both have extensive ties to the UCLA Health System.   Defendant Feinberg serves as the President and CEO of UCLA Hospital.   Defendant Luskin is a director of the UCLA Foundation and serves on the Board of the Santa Monica – UCLA Medical Center and Orthopedic Hospital.    During the Relevant Period, Defendant Luskin donated 50,000 shares to UCLA for proceeds of more than $4 million.   As a result of these longstanding professional relationships among themselves, Defendants Feinberg and Luskin are incapable of bringing suit against each other on behalf of the Company.

217.   Defendants Chopra, Mehra, and Good have personal and familial ties to each other.   Specifically, Chopra and Mehra are first cousins.

Moreover, Defendant Mehra is the brother of — and Defendant Chopra is the first cousin of — Rajiv Mehra, a longtime business colleague and investment partner of Defendant Good. Good and Rajiv Mehra were partners together at the accounting firm of Good, Swartz, Brown & Berns, and its predecessors and successors, from approximately 1987 until 2010, and remain employed by its successor firm, Cohn Reznick. Rajiv Mehra also held significant investments in OSI alongside Good as part of the pension and profit plan of Good, Swartz, Brown & Berns. As a result of these personal relationships among themselves, Chopra, Mehra, and Good are incapable of bringing suit against each other on behalf of the Company.

218. Moreover, Defendants Good and Luskin are entrenched because they have served as directors of the Company since 1987 and 1990, respectively. As a result, Good and Luskin are incapable of bringing suit against each other or against Defendant Chopra, the Company's founder, and cannot exercise independent judgment about the best interests of OSI.

219. Accordingly, demand on Defendants Chopra, Mehra, Good, Feinberg, and Luskin is futile and excused.

**VI. All Individual Defendants Face a Substantial Likelihood of Liability Because They Had Actual Knowledge of — or Recklessly Disregarded — the Material Undisclosed Facts**

220. All Individual Defendants knew or recklessly disregarded the undisclosed material facts alleged herein. As a result, they acted in bad faith and any demand on them is futile.

221. An inference of the Individual Defendants' knowledge is warranted under both the "core product" doctrine and because of the temporal proximity of the false financial statements to the revelation of the truth.

222. With respect to an inference of knowledge under the core product doctrine, as specifically alleged *supra*, OSI is highly dependent on Rapiscan.  According to OSI's 2013 Annual Report on Form 10-K, which was signed by all Individual Defendants, the Security division, and particularly the Rapiscan machines, are of critical importance to OSI: Through its Security division, the Company designs, manufactures and markets security and inspection systems under the "Rapiscan Systems" trade name.  Rapiscan Systems products fall into four categories—baggage and parcel inspection; cargo and vehicle inspection; hold (checked) baggage screening; and people screening.  They are used to search for weapons, explosives, drugs and other contraband as well as for the safe, accurate and efficient verification of cargo manifests for the purpose of assessing duties and monitoring the export and import of controlled materials.

223. Moreover, the Security division is by far the largest division at OSI.  In fiscal year 2012, the Security division revenues amounted to $391.8 million, or approximately 49% of the Company's revenues. Rapiscan also accounted for revenues of $372.2 million, or approximately 46% of the Company's total revenues, in fiscal year 2013.  Baggage and parcel inspection was one of OSI's most important product lines.  In April 2012, Defendant Edrick described this area in a conference call for investors and analysts:  "This has long been the bread and butter for Rapiscan and it's a very nice product line."  Edrick made similar statements on the importance of this product line throughout the Relevant Period.

224. Because the Security division generates over half of OSI's revenues, and because Rapiscan systems are vital to the Security division's success, Rapiscan systems are OSI's "core product."  The Individual Defendants were charged with the knowledge of the Rapiscan-related issues.  As the Court noted in denying the Defendants' motion to dismiss in

the related securities fraud class action, the Ninth Circuit allows inference of scienter "'where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'"[3]   Because Rapiscan systems are OSI's "core product," knowledge of the key facts and problems with Rapiscan is imputed to the Individual Defendants.   As confirmed by the confidential witnesses referenced in the securities fraud class action complaint, OSI's management and directors had access to all of the information, reports, and testing data regarding Rapiscan and its prospects.

225.   Second, an inference of the Individual Defendants' knowledge is warranted based on the temporal proximity between the false statements and material omissions the Individual Defendants caused the Company to make and the revelation of the truth.   With respect to the ATR software, for example, OSI admitted that Rapiscan became aware of an issue related to software under development months before the issue was publicly disclosed to the stock market.   This admission was made less than six months after Defendant Edrick indicated the ATR software was in final testing, and thus is supportive of scienter.   *See Reese*, 747 F.3d at 574 ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.").

226.   Moreover, several confidential witnesses cited in the amended complaint in the related securities fraud class action indicated that OSI executives and Board members were aware of the problems.   As this Court noted in denying the motion to dismiss in that case:

---

[3]     *Roberti*, ECF No. 60 at 18 (quoting *Reese v Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014)).

This inference [of the defendants' scienter] is buttressed by specific statements from confidential witnesses connecting the problems to the management. For example, Confidential Witness 1, a Senior Test Engineer who worked on the ATR testing, stated that Rapiscan "pretty much knew from the start" that the software was running far behind schedule, and indicated that "for most of my testing we were about a year behind" the original schedule. (Amended Compl. at ¶54.) Confidential Witness 2, who worked at OSI until July 2013, indicated that he "was aware all along that they were trying and having trouble meeting the criteria" for the ATR software, that "the company knew all along that it was a difficult process," and that Rapiscan "never even got close to having the issue solved." (*Id.* at ¶56.) Significantly, Confidential Witness 2 confirmed that OSI "cherry-picked a few machines that were working better [than others]," which clearly establishes knowledge of the problem and knowing obfuscation. (*Id.* at ¶63.) Confidential Witness 4, who worked at Rapiscan until January 2013, stated that ***Quality Director Robert Mosey would have known of any manipulations and that the knowledge would have risen "all the way up to the president and even [CEO]***." (*Id.* at ¶63.)

[Emphasis added.]

227.  Thus, an inference of the knowledge or reckless disregard of the adverse undisclosed facts arises as to the entire Board of Directors due to the core product doctrine, temporal proximity of the false statements to the revelation of the truth, and the allegations of the confidential witnesses in the related securities fraud class action complaint.

## VII.  All Individual Defendants Face a Substantial Likelihood of Liability for Causing OSI to Disseminate False and Misleading Information

228.  The Individual Defendants were responsible for reviewing and approving the Company's financial statements. By authorizing the false financial statements and public statements set forth above, the Individual Defendants were active participants in breaches of candor and duty, and

95

have subjected the Company to, among other things, lawsuits claiming violations of the federal securities laws.

229. A director's breach of the duty of candor is not entitled to protection under the business judgment rule. As a result, any demand upon the Individual Defendants to bring suit against themselves would be a useless and futile act.

230. The Individual Defendants' knowing or reckless breaches of fiduciary duty constitute bad faith under Delaware law. Bad-faith conduct is not protected under the business judgment rule. Thus, all Individual Defendants face a substantial likelihood of liability. Demand is thus futile and excused.

## VIII. Demand Is Futile for Additional Reasons

231. OSI's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of OSI. However, the directors' and officers' liability insurance policies covering the Individual Defendants contain provisions that eliminate coverage for any action brought directly by OSI against these defendants, known as the "insured versus insured exclusion."

232. As a result, if the Individual Defendants were to sue themselves, there would be no directors' and officers' insurance protection. Thus, the Individual Defendants will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

233.  Accordingly, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I
### Breach of Fiduciary Duties
### for Disseminating False and Misleading Information
### (Against All Defendants)

234.  Plaintiffs incorporate by reference and re-allege all preceding and subsequent allegations, as though fully set forth herein.

235.  As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that OSI disseminated accurate, truthful and complete information to its shareholders.

236.  The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to OSI shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

237.  As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### Breach of Fiduciary Duties
### for Failing to Maintain Adequate Internal Controls
### (Against All Defendants)

238.  Plaintiffs incorporate by reference and re-allege all preceding and subsequent allegations, as though fully set forth herein.

239.  As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that

OSI's financial statements were prepared in accordance with GAAP and relevant SEC regulations, and, when put on notice of problems with OSI's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

240. The Individual Defendants willfully ignored the obvious and pervasive problems with OSI's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

241. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**Unjust Enrichment**
**(Against Chopra, Mehra, Edrick, and Good)**

242. Plaintiffs incorporate by reference and re-allege all preceding and subsequent allegations, as though fully set forth herein.

243. By their wrongful acts, Defendants Chopra, Mehra, Edrick, and Good were unjustly enriched at the expense of and to the detriment of OSI and it would be unconscionable to allow them to retain the benefits of their illegal conduct. These Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of OSI common stock, as alleged herein.

244. Plaintiffs, as shareholders of OSI, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all proceeds obtained by Chopra, Mehra, Edrick, and Good, and each of them, as a result of their wrongful conduct and breaches of fiduciary duties.

245. As a result of Defendants Chopra, Mehra, Edrick, and Good's unjust enrichment, OSI has been injured and is entitled to damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against each of the Individual Defendants and in favor of the Company, the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.     Directing OSI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to OSI's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.     Awarding to OSI restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs demand a trial by jury on all issues so triable.

3  Dated:  August 25, 2015                Respectfully submitted,

4                                          SCOTT+SCOTT, ATTORNEYS AT LAW LLP

5                                                /s/John T. Jasnoch

6                                          John T. Jasnoch (281605)
                                           jjasnoch@scott-scott.com
7                                          655 North Central Ave., 17th Floor
                                           Glendale, California  91203
8                                          Telephone:  (213) 985-1274
                                           Facsimile:   (213) 985-1278
9

10                                         SCOTT+SCOTT, ATTORNEYS AT LAW LLP
                                           Donald Broggi
11                                         dbroggi@scott-scott.com
                                           Thomas Laughlin
12                                         tlaughlin@scott-scott.com
                                           The Chrysler Building
13                                         405 Lexington Avenue, 40th Floor
                                           New York, New York  10174
14                                         Telephone:  (212) 223-6444
                                           Facsimile:   (212) 223-6334
15

16                                         *Attorneys for Plaintiff City of Irving
                                           Supplemental Benefit Plan*

17

18                                         BOTTINI & BOTTINI, INC.
                                           Francis A. Bottini, Jr. (SBN 175783)
19                                         fbottini@bottinilaw.com
                                           Albert Y. Chang (SBN 296065)
20                                         achang@bottinilaw.com
                                           Yury A. Kolesnikov (SBN 271173)
21                                         ykolesnikov@bottinilaw.com
                                           7817 Ivanhoe Avenue, Suite 102
22                                         La Jolla, California  92037
                                           Telephone:  (858) 914-2001
23                                         Facsimile:   (858) 914-2002

24

25

26

27

28

THE SHUMAN LAW FIRM
Kip B. Shuman
kip@shumanlawfirm.com
Rusty E. Glenn
rusty@shumanlawfirm.com
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone:  (303) 861-3003
Facsimile:   (303) 484-4886

*Counsel for Plaintiff Marc Hagan*

## VERIFICATION

I, Marc Hagan, verify that I am a shareholder of Nominal Defendant OSI Systems, Inc.  I have reviewed the allegations made in the Verified Consolidated Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the Consolidated Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____August 3_____, 2015

_____
Marc Hagan

## VERIFICATION

I, Charles Anderson, Chairman of and on behalf of City of Irving Supplemental Benefit Plan ("Irving"), hereby declare and verify that Irving is currently an owner of OSI Systems, Inc. ("OSI" or the "Company") stock and has continuously been an owner of the Company's stock since at least as early as February 29, 2012.  I have read the allegations of the complaint and confirm that this action is not collusive and that Irving is capable and willing to fairly and adequately represent the interest of shareholders who are similarly situated in enforcing the rights of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2015, at _Irving_, _Texas_.

City of Irving Supplemental Benefit Plan

_Charles Anderson_
Charles Anderson
Chairman

**EXHIBIT A**



JOSEPH P. GUGLIELMO

Writer's Direct Dial Number
(212) 223-4478

Writer's Direct Email Address
jguglielmo@scott-scott.com

February 11, 2014

**<u>Via Certified Mail and Email</u>**

Victor S. Sze
Corporate Secretary
OSI Systems, Inc.
12525 Chadron Avenue
Hawthorn, California 90250

    Re:  <u>OSI Systems Shareholder Inspection of Books and Records</u>

Dear Mr. Sze:

    I write on behalf of the City of Irving Supplemental Benefit Plan ("Irving"), the owner of 578 shares of common stock of OSI Systems, Inc., ("OSI Systems" or the "Company"), in order to demand inspection of OSI Systems books and records and make extracts thereof pursuant to 8 Del. C. § 220.

**I.  Irving is a Current Shareholder of OSI Systems**

    Irving is a current OSI Systems shareholder with a right to inspect the books and records requested herein.  As evidence of Irving's beneficial ownership of OSI Systems common stock, I have enclosed with this letter the sworn declaration of Charles Anderson, attesting to Irvine's ownership of 578 shares of OSI Systems common stock as of the date of this letter, the continuous ownership of shares of OSI Systems common stock since February 29, 2012, and the intention to continue to hold shares at least through the conclusion of the proceedings contemplated in this demand.  Mr. Anderson's declaration is accompanied by documentary evidence of his beneficial ownership of stock that he verifies to be accurate.  Included in Mr. Anderson's declaration is a power of attorney granting Scott+Scott, Attorneys at Law, LLP ("Scott+Scott") the authority to initiate, pursue and act on  behalf in their demand for books and records.

February 11, 2014
Page 2

**II.     Irving Has a Proper Purpose for Making This Demand – Investigating the Evidence of Wrongdoing at OSI Systems**

Irving makes this demand in order to investigate potential wrongdoing, mismanagement, and breaches of fiduciary duties by the members of the Company's management and board of directors in connection with the events, circumstances, and transactions described herein. Specifically, on November 14, 2012, *Bloomberg News* reported that Congressman Mike Rogers, Chairman of the House Transportation Security Subcommittee, disclosed that the Company may have committed fraud by "knowingly manipulating" the results of an operational test of the Company's Advanced Imaging Technology. The Bloomberg News report also revealed that OSI Systems' Executive Vice President Peter Kant revealed that the Company's Rapiscan Systems unit ("Rapiscan") received a "show cause" letter form the Transportation Security Administration ("TSA") on November 9, 2012, seeking information about the testing of technology used in its body scanners. This disclosure lead to the largest drop in the price of OSI Systems shares in over 15 years as shares dropped $21.40 per share.

Later, on January 22, 2013, the TSA reported that it ended its contract with the Company, and that OSI Systems would be required to bear the costs of removing Rapiscan body scanners from airports, because the TSA concluded that the Company could not meet a congressional deadline to produce generic passenger images instead of images that invade the privacy of passengers. Upon this news, OSI Systems shares dropped $14.03 per share to $57.33, or over 19%. Despite the fact that the persistent problems related to travelers' privacy had been long known to the Company, the problems seemingly were not fixed. On May 20, 2013, OSI Systems reported that the Department of Homeland Security ("DHS") issued a "notice of proposed debarment" to OSI Systems, for the purpose of barring further use of the Company's full-body Rapiscan body scanners. The reasoning behind DHS's proposed bar were concerns that the scanners continued to reveal the naked images of travelers' bodies. Upon this revelation, the price of OSI Systems shares dropped $8.05 per share to $53.25, a drop of over 13%.

Despite these longstanding issues with two of Rapiscan's largest customers in DHS and TSA, OSI Systems continued to jeopardize these relationships. On December 6, 2013, the TSA cancelled a $60 million deal for the Company's carry-on baggage screening equipment. This contract cancellation also included a possibility of a future ban on contracting with the DHS. Even though OSI Systems' problems with DHS and TSA had been well publicized for over a year, the reason for the cancelled contract was that part of the Company's baggage screening machine was manufactured in China, directly violating TSA security policies. Upon this news, the price of the Company's shares dropped $21.69 per share to $43.63, or over 33%

This fraudulent and/or bad faith conduct of OSI Systems' directors and officers has now led to OSI Systems, along with CEO Deepak Chopra and CFO Alan Edrick, being the subject of a securities class action lawsuit styled as *Roberti v. OSI Systems et al.,* No. 13-cv-9174-MWF (C.D. Cal). This suit, combined with the other troubling occurrences set forth above, gives Irving clear suspicion that wrongdoing has occurred at the Company.

February 11, 2014
Page 3

Based on the foregoing, Irving makes this §220 demand for the proper purposes of:

(a)    investigating corporate waste, mismanagement or wrongdoing and breach of fiduciary duties of loyalty and good faith on the part of OSI Systems' officers and directors with respect to the above-described matters;

(b)    determining whether the current directors are fit to continue serving on the board of directors; and

(c)    taking appropriate action in the event the members of the Company's management and board of directors did not properly discharge their fiduciary duties, including the preparation and filing of a shareholder derivative lawsuit, if appropriate.

This demand to inspect OSI Systems' books and records is undertaken in good faith and pertains to Irving's interest in reviewing the manner in which OSI Systems is being managed. The Delaware Chancery Court has consistently found similar shareholder demands to inspect a corporation's books and records for reasons such as this one to be proper. *See, e.g., Melzer v. CNET Networks, Inc.*, 934 A.2d 912 (Del. Ch. 2007); *Grimes v. DSC Communications Corp.*, 724 A.2d 561 (Del. Ch. 1998). Irving is entitled to inspect all necessary books and records to satisfy these stated purposes. *See generally* Trial Transcript and Rulings of the Court, *Indiana Electrical Workers Pension Trust Fund IBEW v. WalMart Stores*, Inc., Civil Action No. 7779-CS (Del. Ch. June 7, 2013). The below demands are necessary and essential to effectuate Irving's purpose.

### III.    Demand for Inspection

Accordingly, Irving requests the following books, records, and documents[1] be made available for inspection by its attorneys, Scott+Scott, during the usual hours of business:

1.    All Board Materials[2] concerning the TSA's Operational Test of the Advanced Imaging Technology described by Mike Rogers, Chairman of the House Transportation Security Subcommittee in his November 13, 2012 letter to Transportation Security Administration Chief John Pistole;

2.    All Board Materials concerning actions taken by the Company in response to the show cause letter from the TSA, received by OSI Systems on November 9, 2012;

---

[1]    The term "documents" includes all correspondence related to a given category, and all electronically created and retained directories, files, documents, spreadsheets, graphical renderings and e-mails with their attachments.

[2]    The term 'Board Materials' means all documents concerning, related to, provided at, considered at, discussed at, or prepared or disseminated in connection with any meeting of the Company's board of directors or any regular or specially created committee thereof, including all presentations, board packages, recordings, agendas, summaries, memoranda, transcripts, notes, minutes of meetings, drafts of minutes of meetings, exhibits distributed at meetings, summaries of meetings, or resolutions.

February 11, 2014
Page 4

3.  All Board Materials concerning actions taken by the Company to meet the congressional deadline for Advanced Imaging Technology to produce generic passenger images;

4.  All Board Materials concerning actions taken by the Company in response to the Department of Homeland Security's Notice of Proposed Debarment, reported by OSI Systems on May 20, 2013;

5.  All Board Materials received from management or external entities reflecting Rapiscan's compliance with TSA and DHS security policies and privacy policies;

6.  All Board Materials that reflect Board oversight of Rapiscan's compliance with Federal Acquisition Regulations regarding contract terms with the TSA and DHS;

7.  All Board Materials concerning foreign made components in the Company's airport scanning machines;

8.  Accounting books or records reflecting how the Company accounted for contracts with the TSA and DHS;

9.  All Board materials concerning Company stock sales or option exercises by executive officers and directors of the Company, including, without limitations, all copies and amendments of insider trading policies, copies of applicable Rule 10b5-1 plans, and documents sufficient to establish any open trading windows applicable to stock sales or option exercises;

10. Documents sufficient to identify all OSI Systems employees who make direct reports to the OSI Systems Board of Directors, or any subcommittee thereof, as well as the positions held by any such employees;

11. For OSI Systems employees identified in request number eight, all reports, draft reports, emails, communications or other documents concerning each of the topics listed in requests 1, 2, 3, 4, 5, 6, and 7 (i.e. the TSA's Operational Test, actions taken by the Company in response to the show cause letter, the congressional deadline, and the proposed debarment, compliance with contractual obligations and TSA/DHS security and privacy policies, compliance with Federal Acquisition Regulations, and foreign made component parts in the airport screening machines).

February 11, 2014
Page 5

## IV.      Conclusion

Irving hereby demands that: (1) originals or attested copies of the foregoing documents and records be made available for inspection and copying by Scott + Scott, Attorneys at Law, LLP and its attorneys and agents, during usual business hours until the inspection is completed; or (2) the Company deliver copies of such records, within five business days after receipt of this letter, to the attention of Joseph P. Guglielmo at Scott+Scott, Attorneys at Law, LLP, 405 Lexington Ave., 40th Floor, New York, New York, 10174; Tel. (212) 223-6444. We will reimburse the Company the reasonable copy costs if the documents are sent to Scott+Scott, Attorneys at Law, LLP.  We will agree to enter into a reasonable Confidentiality Agreement.

Please advise as soon as possible, and in any event, on or prior to the expiration of five business days after the date this demand is received by the Company, when and where the items demanded above will be made available or, in lieu thereof, when copies of such items will be delivered.

Very Truly Yours,
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

Joseph P. Guglielmo, Esq.